THOMSON (WATERMAN v.). See Case No. 17,260.

THOMSON (WEAVER v.). See Case No. 17,311.

## Case No. 13,985.

THOMSON et al. v. UNITED STATES.

### The PATRIOT.

[1 Brock. 407.] [1]

Circuit Court, D. Virginia. May Term, 1820.

NON-INTERCOURSE — ARRIVAL WITHIN UNITED STATES—TAKING PILOT—DECLARATION OF WAR—EFFECT ON ALIEN ENEMY.

1. Under the third section of the act of congress, passed on the 1st of March, 1809 [2 Stat. 528], "to interdict the commercial intercourse between the United States, and Great Britain, and France, and for other purposes," commonly called the non-intercourse law; which was re-enacted "against Great Britain, her colonies, and dependencies," on the 2d of March, 1811 [2 Stat. 651], the forfeiture of the vessel and cargo attached, in accordance both with the letter and spirit of the law, the instant that a British vessel came, voluntarily, within the limits of the United States. And the arrival of the vessel within the Chesapeake Bay, is an "arrival within the limits of the United States," in the sense of the act.

[Cited in The Sam Slick, Case No. 12,282.]

2. The allegation, admitting it be true, that the owner was advised to take a pilot on board, because a storm might be expected, (the weather being fair at the time,) is not sufficient to bring the vessel within the exception of the law, viz., vessels "forced in by distress, or by the dangers of the sea."

3. The non-intercourse law, was not repealed by the declaration of war with Great Britain, except so far as its provisions were inconsistent with a state of war, and were annulled by the paramount operation of the laws of war. The laws of war condemn the vessel, but do not reach the cargo. The municipal law condemned both vessel and cargo. The non-intercourse law, therefore, was not entirely abrogated by the declaration of war, but was left to operate in full force on the cargo

4. Where a subject of a foreign government, at peace with the United States, is employed by American citizens, as agent and supercargo, to carry a cargo to a foreign port, dispose of it there, and bring back to the United States, a return cargo, consisting of articles interdicted by the municipal law; and before the arrival of the agent, with the return cargo, within the United States, war is declared between the United States, and the government of which the agent and supercargo is a subject; and after such declaration of war, the agent and supercargo, brings the vessel, (the property of the agent,) with her cargo, within the limits of the United States; the cargo is not exempted by these circumstances, from the operation of the municipal law, interdicting its introduction, under pain of forfeiture. Although the agent, at the time of the arrival of the vessel and cargo, within the United States, was an alien enemy, and although war, if it does not dissolve, at least suspends, all contracts between enemies, and enables the belligerent to annul them; although the cargo was brought within the United States, by the enemy agent, without the consent of the American proprietors: still, the enemy character of the agent, acting under his original authority, cannot exempt his employers from the penalty attached, by law, to the offence so committed.

[1] [Reported by John W. Brockenbrough, Esq.]

[Appeal from the district court of the United States for the district of Virginia.]

This was a libel against the schooner Patriot, a British vessel, and her cargo, owned partly by a British subject, and partly by citizens of the United States, which arrived in the Chesapeake Bay, in June 1812, three days after the declaration of war, between the United States and Great Britain, from the island of Guadaloupe, a British colony, contrary to the several acts of congress, to interdict the commercial intercourse between the United States and Great Britain, her colonies and dependencies. The district court of the United States at Norfolk, condemned the vessel and her cargo [case unreported], and from this decree, the claimants appealed to this court.

MARSHALL, Circuit Justice. The schooner Patriot, a British vessel, then lying in the port of Norfolk, was purchased in February 1812, by Oswald Lawson, a British subject, then, and for some time before, a resident of the town of Norfolk. This purchase was made by Lawson, at the instance of Henry Thomson, and Robert Dixon, citizens of the United States, whose object was, a mercantile voyage to the West Indies, and who advanced the whole purchase-money, and took a bottomry bond, as security for the repayment thereof. The schooner sailed for the West Indies in Feb. 1812, with a cargo owned by Thomson & Dixon, which was placed under the control of Oswald Lawson, as supercargo. He sold his cargo in the West Indies, and took on board at Guadaloupe, a return cargo, consisting of sugars, belonging chiefly to Thomson & Dixon, with which he sailed from Guadaloupe in May 1812, bound to Halifax, in Nova Scotia, but with a determination to lie off the capes of Virginia, until explicit instructions should be received from Thomson, one of the owners of the cargo, residing in Norfolk. She arrived off the capes of Virginia in June, immediately after the declaration of war was known in Norfolk. Lawson, the supercargo and owner of the vessel, being ignorant of that event, despatched the mate with a letter of advice to Thomson, and determined to await the return of his messenger off the coast. In this interval, however, he entered the capes, but sailed out of them again, without coming to anchor. The mate never returned, he being seized in Norfolk, as a prisoner of war. Two days after the mate had been landed, while the Patriot was lying off on the coast, about ten miles from land, and about forty south of the capes, she fell in with a pilot boat, and took a pilot on board. The supercargo says, that he at first declined taking a pilot on board, as the vessel was not bound inward, but was persuaded by the pilot to do so, who represented the probability of an approaching storm from the coast. To avoid this storm, he determined to wait within the capes for instructions. The pilot taken on board, who was an apprentice of the owner of the boat, denies that such advice was given. The vessel was brought within the capes, with the knowledge of Lawson, the owner and supercargo. On its being known in Norfolk, that a British vessel was off the capes, the revenue cutter was sent to take her, and fell in with her, about three miles within the capes, in the road leading to Lynhaven Bay, and also to Hampton Roads. She was brought into Norfolk and libelled. The first allegation of the libel is, that she was a British schooner, which had come within the limits and territories of the United States of America, having on board a cargo of the growth, &c., of a dependency of Great Britain, to wit, of the island of Guadaloupe. The second allegation is, that the cargo was imported into the United States, contrary to the true intent and meaning of the acts of congress. The third charge alleges, that the cargo was taken on board, for the purpose of being imported into the United States, with the knowledge of the owner.

Before entering into the consideration of the arguments belonging to the cause, it may not be altogether improper to notice some preliminary observations, which were made on the union of the prize jurisdiction, with that over municipal forfeitures, in the courts of the United States. As this union is not the act of the court, the only remark which will be made respecting it, is, that in this case, it can have no possible operation on the claimants, unless it be one which is beneficial to them. By mingling the proceedings, ship papers, which were obtained under the practice in prize causes, might be offered on a prosecution for a municipal forfeiture. How far the use of such papers might be allowed, is a question which will be decided, when the case occurs. In this case, those papers are not offered. Having been seized by the officers of the United States, the owners are excused for their non-production, and the voyage is admitted to be, according to their own statement of it. The seizure of the ship's papers, therefore, is either unimportant in this case, or an advantage to the claimants. The forfeiture of the vessel and cargo, is claimed under the third section of the act, "to interdict the commercial intercourse between the United States, and Great Britain, and France, and for other purposes," which was passed on the 1st of March, 1809, and was re-enacted "against Great Britain, her colonies, and dependencies," on the 2d of March, 1811. 2 Story's Laws, p. 1115, c. 91, § 3 [2 Stat. 529, c. 24] and 2 Story's Laws, p. 1187, c. 96 [2 Stat. 651, c. 29]. By the third section of the act of 1809, the entrance into the harbours and waters of the United States, is interdicted to all ships or other vessels, sailing under the flag of Great Britain, or France, or owned, in whole or in part, by any subject or citizen of either. And if any such vessel shall "arrive, either with or

without a cargo, within the limits of the United States, or of the territories thereof, such ship or vessel, together with the cargo, if any, which shall be found on board, shall be forfeited," &c. Under this section the Patriot, which was a British vessel, and her cargo, part of which belonged to citizens of the United States, were condemned in the district court.

The claimants have appeared, and contend that this sentence is erroneous; because,

1st. The Patriot had not arrived within the limits of the United States, at the time when she was seized by the revenue cutter. The term "arrival," when applied to a vessel, is said to be equivalent to the term "importation," when applied to goods; and a vessel cannot be properly said to have arrived, within the meaning of the act, whose cargo might not, with equal propriety, be said to be imported. Without denying or affirming that in the laws of congress, the term "importation," when applied to a cargo, is precisely equivalent to the term "arrival," when applied to a vessel, I will inquire, whether the meaning of the word itself be in any manner ambiguous. "To arrive" is a neuter verb, which, when applied to an object moving from place to place, designates the fact of "coming to" or "reaching" one place from another, or of coming to or reaching a place by travelling, or moving towards it. If the place be designated, then the object which reaches that place has arrived at it. A person who is coming to Richmond, has arrived when he enters the city. But it is not necessary to the correctness of this term, that the place at which the traveller arrives should be his ultimate destination, or the end of his journey. A person going from Richmond to Norfolk, by water, arrives within Hampton Roads, when he reaches that place; or, if he diverges from the direct course, he arrives in Petersburg, when he enters that town. This is, I believe, the universal understanding of the term. Thus, the duty law requires, that the master of every vessel bound to Bermuda Hundred, or City Point, shall, on his arrival in Hampton Roads, or at Sewall's Point, deposit his manifest with the collector of Norfolk, or of Hampton. It also requires, that the master of any vessel, bound to any port of the United States, shall, on his arrival within four leagues of the coast, upon demand, produce his manifest, in writing, to any officer of the customs who shall first come on board. No person can doubt, that in the first case, the vessel bound to City Point, has arrived in Hampton Roads, when she enters the Roads; and that a vessel bound to any port of the United States, say to Boston, has arrived within four leagues of the coast, when she comes within that distance of land. It would be useless to multiply quotations on this point. The literal sense of the word seems too plain for controversy. When the law enacts, that a British vessel, which arrives within the limits of the United States shall be forfeited, the forfeiture attaches, according to its letter, the instant that a vessel comes, voluntarily, within those limits. Now, whatever doubt may exist respecting the application of this term to any part of the open sea, no doubt, I believe, has ever been suggested respecting the Chesapeake Bay. That bay is clearly within the limits of the United States; and the forfeiture, under the letter of the act, is as complete as if it had attached, by the words, on her arrival within the Chesapeake Bay. Is the spirit of the law more favourable to the claim than its letter? By the spirit of the law, I understand, the intention of the legislature, to be collected from the general language of the act, the scope of its provisions, and the objects to be attained.

The object of this section cannot be doubted. It is to exclude all vessels owned by British subjects, from the waters of the United States. Its language conveys this intention, and is obviously calculated to carry it into full effect. The other sections of the law, which are designed to prohibit all intercourse with Great Britain, and to exclude all British goods, show a rigorous determination on this whole subject, which forbids the suspicion that the intention of the legislature, or in other words, the spirit of the law, is more favourable to the claimants than its letter. If this be the object of the act, can we doubt that it would have been completely defeated by allowing British vessels to come unmolested within the Chesapeake, and the other bays of the United States? If the Patriot might enter the Chesapeake with impunity, where is the line drawn, or who has drawn it, which she might not pass? Might she not pass the mouth of the James, the York, the Rappahannock, or the Potomac? Are any of these points more certainly within the limits of the United States, than this middle ground within the capes? And if British vessels, laden with British goods, might with impunity lie within the Chesapeake, and the other bays of the United States, what would become of the non-intercourse act? The Patriot being completely within the enacting clause, it is scarcely necessary to say that she has not brought herself within the exception. She was not "forced in by distress, or by the dangers of the sea." The only allegation which looks towards this subject is, that the owner was advised to take a pilot on board, because a storm might be expected. No storm had commenced. All was fair. But the pilot said one might be expected. Even this is denied by the pilot who was put on board. But, admitting the allegation to be true in its utmost extent, can this imagined fear, this apprehension of uncertain danger, satisfy the words, "forced in by the dangers of the sea?" If they may, language seems to have lost its use, and I am persuaded that non-intercourse laws would do very little good

or harm.[2] I think, then, it cannot be doubted, that the Patriot, being stated in the claim to have belonged to a British subject, comes within the third section of the act. This would be my opinion, were it a case of the first impression. But the point is, I think, decided in The Penobscot v. U. S., 7 Cranch [11 U. S.] 356; 2 Pet. Cond. R. 528.

2d. The second point made for the claimants is, that the non-intercourse act of 1809, was not re-enacted by the act of March 2d, 1811, so far as respected British vessels. Although the third section of that act is expressly re-enacted, yet its re-enactment is limited. It is to be carried into effect, "against Great Britain, her colonies, and dependencies." So much of the act, then, as relates merely to British vessels, has been, it is said, permitted to expire. This strict exposition of the words is the more to be insisted on, because the law is highly penal. Let this argument be examined. The original act respected equally the vessels of France and Britain, and articles of their growth, produce, or manufacture. Its object was to interdict the entrance into the waters of the United States, to the vessels of both nations, and to forbid all commercial intercourse with either of them. The 1st and 2d sections of the act, relate solely to national ships. The 3d section is confined to vessels owned, wholly, or in part, by the subjects of Great Britain or of France. The 4th, 5th, and other sections, relate to the dominions, &c. of the two countries, and to articles which are the growth, produce, or manufacture of either. They also contain provisions, calculated to secure the exclusion of those articles from the United States. After making a painful experiment of the restrictive system against both nations, the law was permitted to expire, and the policy of the United States was in some degree varied. An act was passed on the 1st of May, 1810 [2 Stat. 605], promising, that if either belligerent would so revoke or modify its edicts, that they should cease to violate the neutral commerce of the United States, the sections of the non-intercourse law, which have been recapitulated, should, three months thereafter, be "revived, and have full force and effect, so far as relates to the dominions, colonies, and dependencies, and to the articles, the growth, produce, or manufacture of the dominions, colonies, and dependencies, of the nation refusing or neglecting to revoke, or modify, her edicts, in the manner aforesaid." The president having issued his proclamation, on the 2d of November, 1810, announcing, as a fact, that the decrees of France were revoked, as required by the act of the 1st of May preceding, congress, on the 2d of March, 1811, passed the act under which the Patriot and her cargo have been condemned. The case depends on the question, whether the 3d section is re-enacted so far as respects British vessels. The language of the law, certainly, does not import a complete re-enactment of the whole of those sections. They are in terms re-enacted, "against Great Britain, her colonies, and dependencies." The question, whether these words comprehend the interdiction of our waters, to vessels owned by British subjects, is undoubtedly open for argument, and for consideration. In deciding it, we must search by legitimate means for the intention of the legislature, and be guided by that intention. Was it the intention of the legislature to revive the whole act, so far as it respected Great Britain, with, perhaps, the exception of its territorial operation, which may be created by omitting its provision respecting her possessions? Or only to revive those parts of the act, which relate exclusively to those breaches of it, which are connected with territory? Such, for example, as importing a cargo from "Great Britain, her colonies, or dependencies"? That the act of 1809 is not revived generally, is satisfactorily accounted for, when we recollect that it was originally directed against both Great Britain and France, and that the legislature designed to re-enact it against Great Britain only. If we advert to this fact, and recollect the history of the times, we shall be but little inclined to the opinion, that congress could have intended to leave our ports open to British vessels, when all commercial intercourse between the two countries was prohibited. It seems impossible to assign a motive for this particular relaxation. The policy of the United States, was directed with at least as much earnestness against the navigation, as against the manufactures, of Great Britain. But what seems conclusive on this point is, that the section is expressly revived, and yet contains not one word which relates to the territories of Great Britain, its colonies, or dependencies. The section is limited to ships owned wholly or in part by British subjects. Consequently, it applies to those vessels or to nothing. The legislature might have revived the 3d section only. Had this been done, could it have been said that it was not revived as to vessels, because it was said to be revived against Great Britain, her colonies, and dependencies? Not a syllable in the section relates to colonies and dependencies; and not a syllable to Great Britain, except the prohibition to her vessels. To have said in that case, that the section was not revived as to vessels, would have been to ascribe to the legislature a declaration, that a particu-

---

[2] The necessity must be urgent, and proceed from such a state of things as may be supposed to produce on the mind of a skilful mariner, a well grounded apprehension of the loss of the vessel and cargo, or of the lives of the crew. It is not every injury that may be received in a storm, as the splitting of a sail, the springing of a yard, or a trifling leak, which will excuse a violation of the laws of trade. Livingston, J., in the case of The New York, 3 Wheat. [16 U. S.] 68; The Aeolus, Id. 395.

lar section should be revived in a manner to have no effect whatever: or to make a law, with an exception co-extensive with its whole enactment. Such a construction must be totally inadmissible. The actual case is stronger than that supposed, because, in the actual case, other sections are revived, which might suggest the propriety of adding the words, "colonies and dominions" to Great Britain.

It cannot, I think, be necessary to add any thing to this argument. Yet I will observe, that the act of May 1, 1810, which was perpetual, provided for the whole subject which was re-enacted in March, 1811. I can conceive no motive for the last law, other than an apprehension, which I believe was not well founded, that the courts might not have received the proclamation of the president as conclusive evidence that the fact had occurred, on which the non-intercourse was to be enforced against Great Britain; or might have received other testimony than his proclamation, to prove that Great Britain had modified her edicts so as not to affect the neutral commerce of the United States. Choosing to place it beyond doubt, that this fact was to be decided by the president alone, congress passed the act of March 2, 1811. This being the sole conceivable motive for that act, it cannot be doubted that it was made, or at least intended to be made, co-extensive with the act of May 1, 1810. Yet there are many material variances in the language of the two acts. That of May 1, 1810, enacts, that if the one nation shall revoke her edict, and the other shall not, then the 3d, 4th, &c. sections of the non-intercourse act "shall be revived, and have full force and effect so far as relates to the dominions, colonies, and dependencies, and to the articles, the growth, produce, or manufacture of the dominions, colonies, and dependencies, of the nation so refusing, &c." The act of March 2, 1811, which carries this promise and threat into execution omits the very material words "and to the articles, the growth, produce, or manufactures," &c., and declares only, that the several recited sections of the original act, "shall be carried into effect against Great Britain. her colonies and dependencies." The omission of these very material words might be urged to prove, that the non-intercourse law was not re-enacted with respect to articles of the growth, produce or manufacture of Great Britain, her colonies or dominions, if imported from other than British territory. with at least as much plausibility as the omission to declare. in reviving the 3d section, which relates only to British vessels, that it shall be enforced against British vessels. To prove that the law was not revived as to British vessels, it has been urged, that if it was in force when the Patriot was seized, it is in force now, for which no person will contend; or at least remained in force until a commercial treaty was formed between the two nations, since

it was certainly not repealed by the act of the 14th of April, 1814. This is true; but I do not think that an inadvertence of this kind, an inadvertence sufficiently accounted for, by the existence of a war, which of itself excluded British vessels, when the repealing act passed, and the oblivion into which the return of peace threw the whole subject, can influence the construction of the acts of 1810 and 1811.[3]

An argument which produces the only serious doubt which can arise in this case, remains to be noticed. It is, that the 3d section of the non-intercourse act was repealed by the declaration of war. It has been argued, that all the provisions of that act were obviously adapted to a state of peace: that the declaration of war changed so entirely the relations of the two countries to each other, as to render those provisions, which were made for a state of peace, totally inapplicable to that new state in which war placed the parties. This argument has been illustrated, by showing the incompatibility of those provisions which respect the national ships of Great Britain, with a state of war. It is certainly true that the whole system of non-intercourse was framed, with a view to a continuance of a state of peace. But it does not follow, that positive and general regulations, formed in language equally adapted to peace or war, shall, because they were particularly intended for a state of peace, expire on a declaration of war, unless there be something in war totally incompatible with their continuance. When this is the case, the declaration of war, being a national act of complete obligation, repeals all laws inconsistent with the state in which it places the nation, on the principle that posterior laws abrogate those which are anterior. But when the laws can exist and be executed together, I know of no principle which will authorize the court to say that the last law repeals the first. This principle is completely illustrated by different parts of the case now under consideration. The first section of the original non-intercourse act, forbids the national vessels of Great Britain, to enter the waters of the United States, and authorizes the president to employ the military and naval force of the nation, for the removal of any vessel, which shall violate this provision of the act. The declaration of war, makes it the duty of the president not to obey this mandate of the non-intercourse law, but to capture the vessel as prize of war. It is obvious, that this last law as entirely abrogates the first during its continuance, as if it had in terms commanded the president not to remove the offending vessel from the waters of the United States, but to cause her to be brought in as prize of war. But those provisions of the act, which prohibit the im-

---

[3] Note by Circuit Justice Marshall: This is a mistake. There is a repealing act, which was not observed when this opinion was drawn.

portation of goods of British manufacture, &c., though framed in time of peace, for a state of peace, are not incompatible with a state of war, and they may be continued, or discontinued, at the will of the legislature. I cannot, then, consider them as repealed by the mere declaration of war. British manufactures, the property of a friend, may be introduced or prohibited, in peace or in war, as shall seem wise to the legislature. A law, then, prohibiting them, which does not in its terms, depend on peace or war, would seem to me not to be repealed by a declaration of war. The will of the legislature for its repeal must be more directly expressed, or the law continues in force.

But if we examine our course of legislation on this subject, we shall find conclusive evidence that, in the opinion of the legislature, the law continued in force. Immediately after the declaration of war, the prize act was passed. The 14th section of this act repeals so much of all preceding acts, as may prohibit the introduction, into the United States, of goods of British manufacture, &c. as may be captured from the enemy, and be made good and lawful prize of war. (Act concerning letters or marque, prizes and prize goods, passed June 26, 1812. 2 Story's Laws, p. 1264, c. 107, § 14 [2 Stat. 763, c. 107].) There cannot be a stronger evidence of the opinion of the legislature, that this declaration of war left their non-intercourse law in full force. Afterwards, on the 14th of April, 1814 [3 Stat. 123], the act laying an embargo was repealed, and so much of every act, as prohibits the importation of British goods, &c., or as prohibits the importation of any goods from Great Britain, &c., is repealed. We observe, that the embargo law is totally repealed. But the non-intercourse law is repealed only in part. The language of the act, shows the opinion of the legislature to have been, that parts of the act still remained in force. If, then, we respect the very intelligible opinion of the legislature, or are governed by those rules which generally prevail, in the construction of statutes, I think, we must be brought to the conclusion, that the non-intercourse law, so far as respected goods, &c., imported from Great Britain, her colonies, or dependencies, or articles of the growth, produce, or manufactures of Great Britain, or her dependencies, imported from any place whatever, continued in force, after the declaration of war.

That the act continued in force, so far as respected vessels, owned by British subjects, is not quite so obvious. Since every vessel, forfeited under the non-intercourse law, would also, if captured, be forfeited by the laws of war, it may well be doubted, whether the declaration of war does not suspend so much, at least, of the non-intercourse law, as applies to the very objects, to which the laws of war apply. The Patriot, for example, was a vessel belonging to the enemy, subject to capture, according to the laws of war. The revenue cutters are a part of the naval force of the United States, which may be employed by the president, to prosecute the war, and the 14th section of the prize act, recognizes captures made by them. It may, therefore, admit of some doubt, whether this, so far as respects the vessel itself, may not be a belligerent capture. But suppose this to be admitted, does it follow, that the non-intercourse law may not apply to the cargo? The laws of war condemn the vessel, but do not reach the cargo. The municipal law condemns both vessel and cargo. If the paramount operation of the laws of war upon the subject, overreaches the municipal forfeiture of the vessel, does it, therefore, discharge the cargo, to which its provisions do not extend? The declaration of war does not appear to me, to affect the municipal forfeiture in any case, in which it does not itself dispose of the subject.

The strongest point of view, in which this question has been placed, remains still to be considered. The owner of the Patriot was an enemy. He was on board, and had the control of the vessel. He brought her into the Chesapeake, and it is denied, that his act can forfeit the goods of the American claimant. War, it is said, by way of illustrating this argument, dissolves all contracts between enemies; and, if the owner of the Patriot, instead of bringing her into the Chesapeake, had carried her into the Thames, he would not, even after the return of peace, have been responsible to the owners of the cargo. It will be admitted, that war, if it does not dissolve contracts between enemies, suspends their obligation, and enables the belligerent to annul them. It is also admitted, as a consequence of this principle, that if the owner of the Patriot had carried her into the Thames, and there libelled her cargo, he could not have been made responsible for it. The reason is, that those paramount duties which the war imposed upon him, would, in a legal sense, justify the act of carrying enemy property into the ports of his country, and protect him from the consequences of that act. The right of property would have been changed, by an act which the law had rendered lawful; and, however that act may wound the moral sense, the law cannot punish it. But, although the war would have justified the carrying the Patriot into the Thames, it did not justify bringing her into the Chesapeake, in violation of a statute of the United States. That act, therefore, remains exposed to the same punishment, as if war had not been declared.

It has been argued, that the act of an enemy, to which the American proprietor of the cargo has not consented, ought not to affect his property; and that the declaration of war having dissolved the connexion between the parties, the act of bringing the vessel into the waters of the United States, is to be considered as if it had been an act of violence by any other person, without au-

thority. But this argument is rather calculated to perplex, than to satisfy, the mind. Lawson had, in fact, the direction of the voyage, and continued in that direction. Although he might, with impunity, have ceased to act as the agent of the owners of the cargo, and have acted as an enemy, yet he did not divest himself of the character of an agent, nor assume that of an enemy. Acting under his original authority, he violated the laws of the United States; and those who employed him must, I think, pay the penalty incurred by that violation. The enemy character of an agent, cannot, I think, exempt his employer from the penalty attached by law, to an offence. But the words of the act, subject to forfeiture the cargo of a citizen imported in a British vessel. The terms of the law punish the act, without inquiring into the criminal intent. The cargo of a British vessel, arriving within the limits of the United States, is exempt from forfeiture only, if "forced in by distress, or by the dangers of the sea." These are the only exceptions found in the act. If any others can be introduced by construction, they must be founded on the substantial principles of equity, not on the technical subtleties of law.

It has also been argued, that had this vessel been captured and brought in by an American cruiser, or even by the owners themselves, the cargo would not have been forfeited. This may be true. But in that case, the captors would have been in the exercise of the rights of war; and the vessel, with her cargo, would have been brought in jure belli. In this case, the act declaring war, and the prize act, might have operated on the municipal forfeiture, and have suspended it. But in the case which has occurred, the act which created the forfeiture is not performed in the exercise of the rights of war, but is an act totally unconnected with war.

I have considered this case with no disposition favourable to the condemnation of this cargo. But, according to the view I have taken of the subject, the cargo is liable to forfeiture, in consequence of being in a British vessel, which has arrived within the limits of the United States, while the non-intercourse law was in force. I shall not regret it, if a higher tribunal shall be of a different opinion.

The sentence of the district court is affirmed with costs.

