## RHODES v. IOWA.

### ERROR TO THE SUPREME COURT OF THE STATE OF IOWA.

No. 21.   Argued February 23, 1898. — Decided May 9, 1898.

Section 1553 of the code of Iowa, which provides that "if any express company, railway company or any agent or person in the employ of any express company, or of any common carrier, or any person in the employ of any common carrier, or if any other person shall transport or convey between points, or from one place to another within this State, for any other person or persons or corporation, any intoxicating liquors, without having first been furnished with a certificate from and under the seal of the county auditor of the county to which said liquor is to be transported or is consigned for transportation, or within which it is to be conveyed from place to place, certifying that the consignee or person to whom said liquor is to be transported, conveyed or delivered, is authorized to sell such intoxicating liquors in such county, such company, corporation or person so offending, and each of them, and any agent of said company, corporation or person so offending, shall, upon conviction thereof, be fined in the sum of one hundred dollars for each offence and pay costs of prosecution, and the costs shall include a reasonable attorney fee to be assessed by the court, which shall be paid into the county fund, and stand committed to the county jail until such fine and costs of prosecution are paid," cannot be held to apply to a box of spirituous liquors, shipped by rail from a point in Illinois to a citizen of Iowa at his residence in that State while in transit from its point of shipment to its delivery to the consignee, without causing the Iowa Law to be repugnant to the Constitution of the United States.

Moving such goods in the station from the platform on which they are put on arrival to the freight warehouse is a part of the interstate commerce transportation.

THE case is stated in the opinion.

*Mr. Robert Mather* for plaintiff in error.

*Mr. Milton Remley*, attorney general of the State of Iowa, for defendant in error.

MR. JUSTICE WHITE delivered the opinion of the court.

The Chicago, Burlington and Quincy Railroad Company was, in 1891, a common carrier, incorporated under the laws of

Illinois, and operated among others a line of railway from Dallas, Illinois, to Burlington, Iowa, and beyond said point. The Burlington and Western Railway Company was, at the same date, a common carrier, incorporated under the laws of Iowa, and operated a line of railway from Burlington, Iowa, to Oskaloosa in that State, with stations at intervening points, one of which was Brighton in Washington County. Both of these corporations had a depot at Burlington, which they jointly used. The two carriers had, at the time stated and for years previous thereto, between themselves joint freight tariffs, by which transportation, under a single through way bill, was given to merchandise from any station on either of the lines to any station on the line of the other.

In August, 1891, the Dallas Transportation Company delivered to the Chicago, Burlington and Quincy Railroad at Dallas, Illinois, a wooden box stated to contain groceries consigned to William Horn, Brighton, Iowa. It had been the habit of the agent of the Dallas company before this date to ship intoxicating liquors over the Chicago, Burlington and Quincy. The box in question was receipted for as through freight and was billed through in accordance with the custom above stated, was taken to Burlington, Iowa, there delivered to the Burlington and Western company, by whom it was carried to Brighton. On its arrival there, the package was placed by the trainmen on the station platform, and shortly afterwards the plaintiff in error, who was the station agent of the Burlington and Western, in the discharge of his duties opened the door of the freight house and moved the box into a freight warehouse, which was about six feet from the platform. In about an hour thereafter the box was seized by a constable under a search warrant, on the ground that it contained intoxicating liquors, which proved to be the truth, and subsequently the liquor was condemned and ordered to be destroyed, and the order was executed. At the time of the seizure the freight charge due to the railways was unpaid. It was admitted that there was nothing on the package to notify the receiving railway of its contents, unless such knowledge can be imputed from the nature of the previous dealings of the Dallas com-

pany with the railway. There was, however, testimony showing that the railroad agent who moved the box from the freight platform to the warehouse had reason to know or suspect that it contained liquor since it was proven that, before the arrival of the box at Brighton, a mail carrier called at the station and asked for a package consigned to William Horn, stating that one was expected from Dallas, and that it would contain intoxicating liquor.

The plaintiff in error was proceeded against by information before a justice of the peace, charging him with the unlawful transportation of intoxicating liquors conveyed from Burlington to Brighton, Iowa. This prosecution was under the provisions of the statutes of the State of Iowa, to which we shall hereafter refer. He was convicted and sentenced to pay a fine of $100. An appeal from this sentence was taken to the district court, where it was affirmed, in which court, among other defences, it was alleged that the package in question was not subject to the jurisdiction of the State of Iowa, because at the time of its removal from the platform to the freight warehouse it was in course of interstate commerce transportation. The district court having affirmed the conviction, an appeal was taken to the Supreme Court of the State of Iowa, where the judgment below was also affirmed. *State* v. *Rhodes,* 90 Iowa, 496. To this judgment of affirmance this writ of error is prosecuted.

The sole question presented for consideration is whether the statute of the State of Iowa can be held to apply to the box in question whilst it was in transit from its point of shipment, Dallas, Illinois, to its delivery to the consignee at the point to which it was consigned. That is to say, whether the law of the State of Iowa can be made to apply to a shipment from the State of Illinois, before the arrival and delivery of the merchandise, without causing the Iowa law to be repugnant to the Constitution of the United States.

In *Bowman* v. *Chicago & Northwestern Railway,* 1888, 125 U. S. 465, this court was called upon to determine the validity of a statute of the State of Iowa, which it was asserted was repugnant to the third clause of section 8 of article I of the

Constitution of the United States, because its provisions amounted to a regulation of interstate commerce. The facts upon which the controversy then presented arose were briefly as follows : Kegs of beer were offered in the State of Illinois to a common carrier operating a line of railway in the States of Illinois and Iowa. The beer was consigned to a point in Iowa, and the carrier refused to receive it, on the ground that the statute of Iowa made it unlawful to bring intoxicating liquors within the limits of that State, except when accompanied with a specified certificate, which the Iowa law provided should be granted under particular and exceptional conditions. The one by whom the beer was tendered to the carrier in the State of Illinois thereupon sued the railroad company for the damages claimed to have arisen from its refusal to receive and carry the merchandise. The railway company defended on the ground that it was justified in its refusal because of the provision of the Iowa statute. This, on the other hand, was asserted not to be an adequate defence, because it was claimed that the Iowa statute was wholly void, as it constituted a regulation of interstate commerce. The sole issue arising therefrom was whether the Iowa law protected the refusing carrier, and thus involved determining whether the statute of the State was repugnant to the Constitution of the United States. After great consideration, it was held that the law of the State of Iowa, in so far as it affected interstate commerce, was repugnant to the interstate commerce clause of the Constitution, and was void. It was decided that the transportation of merchandise from one State into and across another was interstate commerce, and was protected from the operation of state laws from the moment of shipment whilst in transit and up to the ending of the journey by the delivery of the goods to the consignee at the place to which they were consigned. The court in the course of its opinion adverted to the question whether goods so shipped continued to be protected by the interstate commerce clause after their delivery to the consignee and up to and including their sale in the original package by the one to whom they had been delivered, but did not decide the question, as it was

not essential to do so. Referring to the subject, however, the court said (pp. 499–500):

"It might be very convenient and useful in the execution of the policy of prohibition within the State to extend the powers of the State beyond its territorial limits. But such extraterritorial powers cannot be assumed upon such an implication. On the contrary, the nature of the case contradicts their existence. For if they belong to one State, they belong to all, and cannot be exercised severally and independently. The attempt would necessarily produce that conflict and confusion which it was the very purpose of the Constitution by its delegations of national power to prevent.

"It is easier to think that the right of importation from abroad, and of transportation from one State to another, includes, by necessary implication, the right of the importer to sell unbroken packages at the place where the transit terminates; for the very purpose and motive of that branch of commerce which consists in transportation is that other and consequent act of commerce which consists in the sale and exchange of the commodities transported. Such, indeed, was the point decided in the case of *Brown* v. *Maryland*, 12 Wheat. 419, as to foreign commerce, with the express statement, in the opinion of Chief Justice Marshall, that the conclusion would be the same in a case of commerce among the States. But it is not necessary now to express any opinion upon the point, because that question does not arise in the present case. The precise line which divides the transaction, so far as it belongs to foreign or interstate commerce, from the internal and domestic commerce of the State, we are not now called upon to delineate. It is enough to say that the power to regulate or forbid the sale of a commodity, after it has been brought into the State, does not carry with it the right and power to prevent its introduction by transportation from another State."

Subsequently, in *Leisy* v. *Hardin*, (1890) 135 U. S. 100, the question which was thus reserved in the *Bowman case* arose for adjudication, and it was held that the right to sell the imported merchandise in the original package free from inter-

ference of state laws was protected by the Constitution of the United States, as up to such sale the goods brought into the State were not commingled with the mass of property in the State. Summing up its conclusions the court said (p. 124): "The plaintiffs in error are citizens of Illinois, are not pharmacists and have no permit, but import into Iowa beer which they sell in original packages, as described. Under our decision in *Bowman* v. *Chicago &c. Railway Co., supra,* they had the right to import this beer into that State, and, in the view which we have expressed, they had the right to sell it, by which act alone it would become mingled in the common mass of property within the State. Up to that point of time we hold that, in the absence of Congressional permission to do so, the State had no power to interfere by seizure, or any other action, in prohibition of importation and sale by the foreign or non-resident importer."

The statute of the State of Iowa, under which the prosecution now before us was instituted, is as follows:

"If any express company, railway company or any agent or person in the employ of any express company, or of any common carrier, or any person in the employ of any common carrier, or if any other person shall transport or convey between points, or from one place to another within this State, for any other person or persons or corporation, any intoxicating liquors, without having first been furnished with a certificate from and under the seal of the county auditor of the county to which said liquor is to be transported or is consigned for transportation, or within which it is to be conveyed from place to place, certifying that the consignee or person to whom said liquor is to be transported, conveyed or delivered is authorized to sell such intoxicating liquors in such county, such company, corporation or person so offending, and each of them, and any agent of said company, corporation or person so offending, shall, upon conviction thereof, be fined in the sum of one hundred dollars for each offence, and pay costs of prosecution, and the costs shall include a reasonable attorney fee to be assessed by the court, which shall be paid into the county fund, and stand committed to the county jail

until such fine and costs of prosecution are paid.   The offence herein defined shall be held to be complete, and shall be held to have been committed in any county of the State, through or to which said intoxicating liquors are transported, or in which the same is unloaded for transportation, or in which said, liquors are conveyed from place to place or delivered. It shall be the duty of the several county auditors of the State to issue the certificate herein contemplated to any person having such permit, and the certificate so issued shall be truly dated when issued, and shall specify the date at which the permit expires, as shown by the county records.   Provided, however, that the defendant may show as a defence hereunder by preponderance of evidence that the character and circumstances of the shipment and its contents were unknown to him."   (Iowa Code, section 1553, paragraph 2410, McClain's Annotated Code of Iowa.)

This statute is identical with the one which was held to be unconstitutional in the *Bowman case*, except that the latter contained the words "knowingly bring within this State," these words having been stricken out by an amendment adopted after the decision in the *Bowman case.*   In other words, the statute which was under review in the *Bowman case* provided, "if any express company, railway company or any agent or person in the employ of any express company, or of any common carrier, or if any other person shall knowingly bring within this State, or transport or convey between points or from one place to another within the State," whilst the statute now before us provides exactly the same thing, except that the words "knowingly bring within this State" are omitted.   It is hence manifest that the present statute, as interpreted by the Supreme Court of Iowa, has exactly the significance it would have did it contain the words found in the act reviewed in the *Bowman case.*   It follows that the law before us now, as interpreted below, is the exact equivalent of the statute which has once before been declared by this court to be repugnant to the Constitution.   This result in reason is inevitable, since the court below held that the words, as found in the present law, were not confined to transporta-

tion of commodities originating within the State, but related to shipments made from another State. This ruling hence subjects shipments made from another State to the control of the statute at once on the arrival of the merchandise within the territorial limits of the State, and before the completion of the interstate shipment, as completely as if the words " bring within this State " were yet in the statute. As it was held in the *Bowman* case that the power to ship from one State into another embraced of necessity the right to have the goods carried to the place of destination, and be delivered at that point to the consignee, it follows that an interpretation of the present law which gives the State the right to stop the goods shipped into the State at the state line, and before their arrival at destination, is directly within the rule announced in the *Bowman* case.

The fundamental right which the decision in the *Bowman* case held to be protected from the operation of state laws by the Constitution of the United States was the continuity of shipment of goods coming from one State into another from the point of transmission to the point of consignment, and the accomplishment there of the delivery covered by the contract. This protection of the Constitution of the United States is plainly denied by the statute now under review, as its provisions are interpreted by the court below. The power which it was held in the *Bowman* case the State did not possess was that of stopping interstate shipments at the state line by breaking their continuity and intercepting their course from the point of origin to the point of consummation. The right of a State to exert these very powers is plainly upheld by the decision rendered below. It follows that if the ruling in the *Bowman* case is applicable to the question here presented, it is decisive of this controversy, and must lead to a reversal of the judgment below rendered. The claim is, however, and it was upon this ground that the court below rested its judgment, that under and by virtue of the provisions of the act of Congress of August 8, 1890, c. 728, 26 Stat. 313, the ruling in the *Bowman* case is no longer apposite, as the effect of the act of Congress in question was to confer upon the State of Iowa

the power to subject to its statutory regulations merchandise shipped from another State the moment it reached the line of the State of Iowa, and before the consummation of the contract of shipment by arrival at its destination and delivery there to the consignee. And it is to this question that the discussion at bar has mainly related, and upon which a decision of the cause really depends.

It is not gainsaid that the effect of the act of Congress was to deprive the receiver of goods shipped from another State of all power to sell the same in the State of Iowa in violation of its laws; but whilst it is thus conceded that the act of Congress has allowed the Iowa law to attach to the property when brought into the State before sale, when it otherwise would not have done so until after sale, on the other hand, it is contended that the act of Congress in no way provides that the laws of Iowa should apply before the consummation by delivery of the interstate commerce transaction. To otherwise construe the act of Congress, it is claimed, would cause it to give to the statutes of Iowa extraterritorial operation, and would render the act of Congress repugnant to the Constitution of the United States. It has been settled that the effect of the act of Congress is to allow the statutes of the several States to operate upon packages of imported liquor before sale. *In re Rahrer*, 140 U. S. 545.

Did the act of Congress referred to operate to attach the legislation of the State of Iowa to the goods in question the moment they reached the state line, and before the completion of the act of transportation, by arriving at the point of consignment and the delivery there to the consignee is then the pivotal question? The act of Congress is as follows:

"That all fermented, distilled or other intoxicating liquors or liquids transported into any State or Territory or remaining therein for use, consumption, sale or storage therein, shall, upon arrival in such State or Territory, be subject to the operation and effect of the laws of such State or Territory, enacted in the exercise of its police powers, to the same extent and in the same manner as though such liquids or liquors had been produced in such State or Territory, and shall not be exempt

therefrom by reason of being introduced therein in original packages or otherwise."

The words "shall upon arrival in such State or Territory be subject to the operation and effect of the laws of such State or Territory," in one sense might be held to mean arrival at the state line. But to so interpret them would necessitate isolating these words from the entire context of the act, and would compel a construction destructive of other provisions contained therein. But this would violate the fundamental rule requiring that a law be construed as a whole, and not by distorting or magnifying a particular word found in it. It is clearly contemplated that the word "arrival" signified that the goods should actually come into the State, since it is provided that "all fermented, distilled or other intoxicating liquors or liquids transported into a State or Territory," and this is further accentuated by the other provision, "or remaining therein for use, consumption, sale or storage therein."

This language makes it impossible in reason to hold that the law intended that the word "arrival" should mean at the state line, since it presupposes the coming of the goods into the State for "use, consumption, sale or storage." The fair inference from the enumeration of these conditions, which are all-embracing, is that the time when they could arise was made the test by which to determine the period when the operation of the state law should attach to goods brought into the State. But to uphold the meaning of the word "arrival," which is necessary to support the state law, as construed below, forces the conclusion that the act of Congress in question authorized state laws to forbid the bringing into the State at all. This follows from the fact that if arrival means crossing the line, then the act of crossing into the State would be a violation of the state law, and hence necessarily the operation of the law is to forbid crossing the line and to compel remaining beyond the same. Thus, if the construction of the word "arrival" be that which is claimed for it, it must be held that the state statute attached and operated beyond the state line confessedly before the time when it was intended by the act of Congress it should take effect.

But the subtle signification of words and the niceties of verbal distinction furnish no safe guide for construing the act of Congress. On the contrary, it should be interpreted and enforced by the light of the fundamental rule of carrying out its purpose and object, of affording the remedy which it was intended to create, and of defeating the wrong which it was its purpose to frustrate. Undoubtedly the purpose of the act was to enable the laws of the several States to control the character of merchandise therein enumerated at an earlier date than would have been otherwise the case, but it is equally unquestionable that the act of Congress manifests no purpose to confer upon the States the power to give their statutes an extraterritorial operation so as to subject persons and property beyond their borders to the restraints of their laws. If the act of Congress be construed as reaching the contract for interstate shipment made in another State, the necessary effect must be to give to the laws of the several States extraterritorial operation, for, as held in the *Bowman case*, the inevitable consequence of allowing a state law to forbid interstate shipments of merchandise would be to destroy the right to contract beyond the limits of the State for such shipments. If the construction claimed be upheld, it would be in the power of each State to compel every interstate commerce train to stop before crossing its borders, and discharge its freight, lest by crossing the line it might carry within the State merchandise of the character named covered by the inhibitions of a state statute. The force of this view is well illustrated by the conclusions of the court below, where it is said :

"Was the defendant, in the removal of the liquor, engaged in transporting or conveying it within the meaning of our statute? The language of the statute is broad enough to cover the act of defendant in removing the liquor from the platform to the freight room of the depot. He was one of the instruments necessary to complete the act of transportation. If it be not so, then clearly he is within the terms of the act, as he conveyed 'the liquor from one point to another within this State.' His guilt is not to be determined by the distance

he conveyed the package, but his conveying it any distance was a violation of the law. With the propriety of legislation, making such an act a crime, and with the severity of the punishment attached to doing the act, we have nothing to do."

If it had been the intention of the act of Congress to provide for the stoppage at the state line of every interstate commerce contract relating to the merchandise named in the act, such purpose would have been easy of expression. The fact that such power was not conveyed, and that, on the contrary, the language of the statute relates to the receipt of the goods "into any State or Territory for use, consumption, sale or storage therein," negatives the correctness of the interpretation holding that the receipt into any State or Territory for the purposes named could never take place. Light is thrown upon the purpose and spirit of the act by another consideration. The *Bowman case* was decided in 1888, the opinion in *Leisy* v. *Hardin* was announced in April, 1890, the act under consideration was approved August 8, 1890. Considering these dates, it is reasonable to infer that the provisions of the act were intended by Congress to cause the legislative authority of the respective States to attach to intoxicating liquors coming into the States by an interstate shipment, only after the consummation of the shipment, but before the sale of the merchandise, that is, that the one receiving merchandise of the character named should, whilst retaining the full right to use the same, no longer enjoy the right to sell free from the restrictions as to sale created by state legislation, a right which the decision in *Leisy* v. *Hardin* had just previously declared to exist.

This view gives meaning and effect to the language of the act providing that such merchandise "shall not be exempt therefrom" (legislative power of the State) by reason of being introduced therein in "original packages or otherwise." These words have no place or meaning in the act if its purpose was to attach the power of the State to the goods before the termination of the interstate commerce shipment. The words "original packages" had, at the time of the passage of the act by the decisions of this court, acquired with reference

to the construction of the Constitution a technical meaning, signifying that the merchandise in such packages was entitled to be sold within a State by the receiver thereof, although state laws might forbid the sale of merchandise of like character not in such packages.

Whilst it is true that the right to sell free from state interference interstate commerce merchandise was held in *Leisy* v. *Hardin* to be an essential incident to interstate commerce, it was yet but an incident, as the contract of sale within a State in its nature was usually subject to the control of the legislative authority of the State. On the other hand, the right to contract for the transportation of merchandise from one State into or across another involved interstate commerce in its fundamental aspect, and imported in its very essence a relation which necessarily must be governed by laws apart from the laws of the several States, since it embraced a contract which must come under the laws of more than one State. The purpose of Congress to submit the incidental power to sell to the dominion of state authority should not without the clearest implication be held to imply the purpose of subjecting to state laws a contract which in its very object and nature was not susceptible of such regulation even if the constitutional right to do so existed, as to which no opinion is expressed. And this view is cogently illustrated by the opinion in the *Bowman case*, where it was said (pp. 486–487):

"Has the law of Iowa any extraterritorial force which does not belong to the law of the State of Illinois? If the law of Iowa forbids the delivery, and the law of Illinois requires the transportation, which of the two shall prevail? How can the former make void the latter? In view of this necessary operation of the law of Iowa, if it be valid, the language of this court in the case of *Hall* v. *De Cuir*, 95 U. S. 485, 488, is exactly in point. It was there said: 'But we think it may safely be said that state legislation, which seeks to impose a direct burden upon interstate commerce, or to interfere directly with its freedom, does encroach upon the exclusive power of Congress. The statute now under consideration, in our opinion, occupies that position. It does not act upon the

business through the local instruments to be employed after coming within the State, but directly upon the business as it comes into the State from without or goes out from within. While it purports only to control the carrier when engaged within the State, it must necessarily influence his conduct to some extent in the management of his business throughout his entire voyage. His disposition of passengers taken up and put down within the State, or taken up within to be carried without, cannot but affect in a greater or less degree those taken up without and brought within, and sometimes those taken up within and put down without. A passenger in the cabin set apart for the use of whites without the State must, when the boat comes within, share the accommodations of that cabin with such colored persons as may come on board afterwards, if the law is enforced. It was to meet just such a case that the commercial clause in the Constitution was adopted. The river Mississippi passes through or along the borders of ten different States, and its tributaries reach many more. The commerce upon these waters is immense, and its regulation clearly a matter of national concern. If each State was at liberty to regulate the conduct of carriers while within its jurisdiction, the confusion likely to follow could not but be productive of great inconvenience and unnecessary hardship. Each State could provide for its own passengers and regulate the transportation of its own freight, regardless of the interests of others. Nay, more; it could prescribe rules by which the carrier must be governed within the State, in respect to passengers and property brought from without. On one side of the river or its tributaries he might be required to observe one set of rules, and on the other another. Commerce cannot flourish in the midst of such embarrassments. No carrier of passengers can conduct his business with satisfaction to himself, or comfort to those employing him, if on one side of a state line his passengers, both white and colored, must be permitted to occupy the same cabin, and on the other be kept separate. Uniformity in the regulations by which he is to be governed from one end to the other of his route is a necessity in his business, and to secure it Congress, which is

untrammelled by state lines, has been invested with the exclusive legislative power of determining what such regulations shall be.'"

And it was doubtless this construction which caused the court to observe in the opinion in *In re Rahrer*, 140 U. S. 545, 552, that the act of Congress "divests them (objects of interstate commerce shipment) of that character at an earlier period of time than would otherwise be the case." We think that interpreting the statute by the light of all its provisions, it was not intended to and did not cause the power of the State to attach to an interstate commerce shipment, whilst the merchandise was in transit under such shipment, and until its arrival at the point of destination and delivery there to the consignee, and of course this conclusion renders it entirely unnecessary to consider whether if the act of Congress had submitted the right to make interstate commerce shipments to state control it would be repugnant to the Constitution.

It follows from this conclusion that as the act for which the plaintiff in error was convicted, and which consisted in moving the goods from the platform to the freight warehouse, was a part of the interstate commerce transportation, and was done before the law of Iowa could constitutionally attach to the goods, the conviction was erroneous, and the judgment below is, therefore,

*Reversed.*


Mr. Justice Gray, with whom concurred Mr. Justice Harlan and Mr. Justice Brown, dissenting.


Mr. Justice Harlan, Mr. Justice Brown and myself are constrained to dissent from this judgment, which appears to us to deny due effect to the police power, reserved to each State by the Constitution of the United States, and recognized by Congress in the act of August 8, 1890, c. 728, commonly known as the Wilson act. 26 Stat. 313.

The purpose and effect of this act may be best understood by recalling the history of the law upon the subject.

In order to keep this opinion within reasonable compass,

we shall, in referring to the previous decisions of this court, confine ourselves, as far as possible, to those decisions which directly relate to the traffic in intoxicating liquors.

The regulation of the manufacture, sale and use of intoxicating liquors has always been recognized as a subject peculiarly appertaining to the police power of the several States respectively. *License cases,* 5 How. 504; *Bartemeyer* v. *Iowa,* 18 Wall. 129; *Beer Co.* v. *Massachusetts,* 97 U. S. 25; *Foster* v. *Kansas,* 112 U. S. 201; *Mugler* v. *Kansas,* 123 U. S. 623; *Kidd* v. *Pearson,* 128 U. S. 1; *Eilenbecker* v. *Plymouth County,* 134 U. S. 31.

Upon the question how far the police power reserved to each State over this subject is affected by the grant to Congress of the power to regulate commerce among the several States, there have been conflicting opinions, and even varying decisions, at different periods.

The earliest cases which came before this court, concerning the extent of the police power of each State over intoxicating liquors within its borders, were *Thurlow* v. *Massachusetts, Fletcher* v. *Rhode Island* and *Peirce* v. *New Hampshire,* decided in 1847, and reported under the name of *The License cases,* 5 How. 504.

In *Peirce* v. *New Hampshire,* a statute of New Hampshire, prohibiting sales of intoxicating liquors by any person without a license from municipal authorities, and authorizing licenses to be granted only to persons residing within the State, was held by all the justices to be constitutional and valid, as applied to a barrel of intoxicating liquors, brought into New Hampshire from another State, and sold in New Hampshire by the importer, in the same barrel, unbroken and in the same condition in which it had been brought in — there having been no legislation of Congress upon the subject.

That decision was afterwards repeatedly cited with approval. *Gilman* v. *Philadelphia,* 3 Wall. 713, 730; *Beer Co.* v. *Massachusetts,* 97 U. S. 25, 33; *Mobile County* v. *Kimball,* 102 U. S. 691, 701; *Mugler* v. *Kansas,* 123 U. S. 623, 657, 658. And in several cases the validity of statutes of a State, taxing the sale of intoxicating liquors brought from another State, was

treated as depending upon the question whether the statutes made any discrimination in favor of liquors manufactured within the State. *Hinson* v. *Lott*, 8 Wall. 148; *Tiernan* v. *Rinker*, 102 U. S. 123; *Walling* v. *Michigan*, 116 U. S. 446, 460.

The question whether the power of Congress to regulate commerce with foreign nations and among the several States is exclusive, or only paramount, was a subject of much diversity of opinion from an early period until 1851, when this court, speaking by Mr. Justice Curtis, in *Cooley* v. *Board of Wardens*, 12 How. 299, laid down this principle: When the nature of the particular subject in question is such as to demand a single uniform rule, operating equally throughout the United States, the power of Congress is exclusive; but when the subject is of such a nature as to require different systems of regulation, drawn from local knowledge or experience, and conformed to local wants, it may be the subject of state legislation so long as Congress has not legislated. 12 How. 319, 320. The principle there laid down has become fully recognized and established in our jurisprudence. *Transportation Co.* v. *Parkersburg*, 107 U. S. 691, 704; *Crandall* v. *Nevada*, 6 Wall. 35, 42; *Mobile County* v. *Kimball*, 102 U. S. 691, 701.

Wherever, from the nature of the subject, the power of Congress to regulate commerce is exclusive, the several States, of course, cannot legislate, even if there has been no legislation by Congress; or, as the proposition has been stated in another form, "where the power of Congress to regulate is exclusive, the failure of Congress to make express regulations indicates its will that the subject shall be left free from any restrictions or impositions; and any regulation of the subject by the States, except in matters of local concern only, is repugnant to such freedom." *Robbins* v. *Shelby Taxing District*, 120 U. S. 489, 493.

The theory that the bringing of intoxicating liquors from one State into another, and the selling of them there in the packages in which they had been introduced, are subjects requiring to be regulated by a national and uniform rule, and therefore within the exclusive power of Congress, and wholly

free from state legislation, was not broached by any member of the court before the cases of *Bowman* v. *Chicago & North-western Railway*, 125 U. S. 465, and *Leisy* v. *Hardin*, 135 U. S. 100.

In *Bowman's case* Chief Justice Waite and two other justices dissented, and in *Leisy's case* three justices dissented; and the reasons for and against the decisions were stated at length in the opinions delivered in those cases. It will be sufficient, for our present purpose, to state the points there decided.

Each of those cases arose under the statutes of the State of Iowa, regulating the manufacture, the sale and the transportation of intoxicating liquors within the State.

*Bowman* v. *Chicago & Northwestern Railway*, decided by this court March 19, 1888, involved the validity of a provision of those statutes, (substantially similar to the provision now before us, as construed by the highest court of the State,) imposing a penalty upon any railroad company or other common carrier, or any agent of either, or any other person, that should knowingly bring within the State, or knowingly transport or convey between points or from one place to another within the State, for any other person or corporation, any intoxicating liquors, without first having obtained a certificate, from the auditor of the county to which it was consigned, or within which it was to be conveyed from place to place, certifying that the consignee was authorized by the laws of Iowa to sell such liquors. The majority of this court, upon a consideration of the whole statute, frankly recognized that " the provision in question has been adopted by the State of Iowa, not expressly for the purpose of regulating commerce between its citizens and those of other States, but as subservient to the general design of protecting the health and morals of its people and the peace and good order of the State, against the physical and moral evils resulting from the unrestricted manufacture and sale within the State of intoxicating liquors." 125 U. S. 475, 476. Nevertheless, the provision was held to be unconstitutional and void, as applied to a railroad company transporting intoxicating liquors into the State from another

State, upon the ground that the State "cannot, without the consent of Congress, express or implied, regulate commerce between its people and those of the other States of the Union in order to effect its end, however desirable such a regulation might be." 125 U. S. 493. The court took pains to distinguish the case from *Peirce* v. *New Hampshire,* above cited, and distinctly reserved the expression of any opinion upon the question whether the State had the right to regulate or prohibit the sale of the liquor by the importer in unbroken packages after it had been brought within the State. 125 U. S. 479, 499, 500.

But in *Leisy* v. *Hardin,* two years later, that question was distinctly presented for decision; and it was decided that the provision of the statutes of Iowa, prohibiting the sale of any intoxicating liquors, otherwise than for pharmaceutical, medicinal, chemical or sacramental purposes, and under a druggist's license from a county court of the State, was, as applied to a sale by the importer, and in the original packages, unbroken and unopened, of such liquors manufactured in and brought from another State, unconstitutional and void, as repugnant to the grant by the Constitution to Congress of the power to regulate interstate commerce. The majority of the court, in its opinion, delivered by the present Chief Justice, April 28, 1890, treated *Peirce* v. *New Hampshire* as overruled; and stated its own conclusions as follows: "The plaintiffs in error are citizens of Illinois, are not pharmacists, and have no permit, but import into Iowa beer, which they sell in original packages, as described. Under our decision in *Bowman* v. *Chicago & Northwestern Railway,* they had the right to import this beer into that State, and in the view which we have expressed they had the right to sell it, by which act alone it would become mingled in the common mass of property within the State. Up to that point of time, we hold that, in the absence of Congressional permission to do so, the State had no power to interfere by seizure, or any other action, in prohibition of importation and sale by the foreign or non-resident importer." And it was said in that opinion that "the responsibility is upon Congress, so far as the regulation

of interstate commerce is concerned, to remove the restriction upon the State in dealing with imported articles of trade within its limits, which have not been mingled with the common mass of property therein, if in its judgment the end to be secured justifies and requires such action." 135 U. S. 123, 124.

Thereupon Congress immediately interposed, and by explicit legislation unequivocally manifested its purpose that no silence on its part should give rise to the presumption that it intended that either the transportation of intoxicating liquors from one State into another, or their sale in the latter State, even in the packages in which they had been brought, should be free, and beyond the reach of the police power of the State.

On May 14, 1890, Mr. Wilson, of Iowa, reported to the Senate, from the Committee on the Judiciary, a bill, which, as amended upon his motion on May 29, was passed August 8 1890, enacting that "all fermented, distilled or other intoxi cating liquors or liquids, transported into any State or Terri tory, or remaining therein for use, consumption, sale or storage therein, shall upon arrival in such State or Territory be subject to the operation and effect of the laws of such State or Territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such liquids or liquors had been produced in such State or Terri tory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise." Con gressional Record, 51st Congress, 1st sess. pt. 5, p. 4642; pt 6, p. 5430; act of August 8, 1890, c. 728, 26 Stat. 313.

Soon after the passage of this act of Congress, the question of its constitutionality and effect was brought before this cour in *Rahrer's case*, 140 U. S. 545. Intoxicating liquors, which had been sent, before the passage of this act, by their owner in Missouri to Rahrer in Kansas to be sold by him on thei account, were, after the passage of the act, sold by him in Kansas as the agent of the consignors and in the original packages. This court unanimously held that Rahrer wa liable to be prosecuted for such a sale under statutes of the State of Kansas, passed in 1889, which made no distinction between imported and domestic liquors.

The Chief Justice, in delivering the opinion of the majority of the court, said: "Congress has now spoken, and declared that imported liquors or liquids shall, upon arrival in a State, fall within the category of domestic articles of a similar nature." 140 U. S. 560. The grant by the Constitution to Congress of the power to regulate interstate commerce, said the Chief Justice, "furnishes no support to the position that Congress could not, in the exercise of the discretion reposed in it, concluding that the common interests did not require entire freedom in the traffic in ardent spirits, enact the law in question. In so doing, Congress has not attempted to delegate the power to regulate commerce, or to exercise any power reserved to the States, or to grant a power not possessed by the States, or to adopt State laws." "No reason is perceived why, if Congress chooses to provide that certain designated subjects of interstate commerce shall be governed by a rule which divests them of that character at an earlier period of time than would otherwise be the case, it is not within its competency to do so." 140 U. S. 561, 562. "Congress did not use terms of permission to the State to act; but simply removed an impediment to the enforcement of the state laws in respect to imported packages in their original condition, created by the absence of a specific utterance on its part. It imparted no power to the State, not then possessed, but allowed imported property to fall at once upon arrival within the local jurisdiction." "This is not the case of a law enacted in the unauthorized exercise of a power exclusively confided to Congress, but of a law which it was competent for the State to pass, but which could not operate upon articles occupying a certain situation until the passage of the act of Congress. That act in terms removed the obstacle, and we perceive no adequate ground for adjudging that a reënactment of the state law was required before it could have the effect upon imported which it had always had upon domestic property. Jurisdiction attached, not in virtue of the law of Congress, but because the effect of the latter was to place the property where jurisdiction could attach." 140 U. S. 564, 565.

The necessary effect of that decision is that the police power of each State includes the regulation of the transportation, as well as the sale, of all intoxicating liquors within its territory, except so far as affected by the grant by the Constitution to Congress of the power over interstate and foreign commerce; and that, so far as Congress manifests its intention that the interests of such commerce do not require its exemption from the exercise of the police power of the State, this power is unrestricted.

The opinions heretofore delivered in this court upon the effect of the act of Congress of 1890, although they do not decide, clearly imply, that the "arrival in such State," contemplated and intended by the act, is an arrival within the territorial limits and jurisdiction of the State. In *Rahrer's case*, the Chief Justice, in the passages already quoted, said that Congress by this act has declared that "imported liquors shall, upon arrival in a State, fall within the category of domestic articles of a similar nature," and has allowed "imported property to fall at once upon arrival within the local jurisdiction." 140 U. S. 560, 564. The natural meaning of these expressions is that imported liquors, upon arrival within the jurisdiction of the State, become at once subject to its jurisdiction. And in *Scott* v. *Donald*, 165 U. S. 58, the phrase used in the opinion of the majority of the court was, "upon arrival in a State," and, in the dissenting opinion, "upon their arrival within the State," without a suggestion in either opinion that the two phrases were not exactly synonymous, or that any "arrival within the State" was not an "arrival in the State." 165 U. S. 99, 102.

The case at bar directly presents the question of the meaning of the words "upon arrival in such State," as used by Congress in this act.

Chief Justice Marshall, when discussing the general meaning of the words "arrival" and "to arrive," said: "'To arrive' is a neuter verb, which, when applied to an object moving from place to place, designates the fact of 'coming to' or 'reaching' one place from another, or of coming to or reaching a place by travelling, or moving towards it. If the place

be designated, then the object which reaches that place has arrived at it. A person who is coming to Richmond has arrived when he enters the city. But it is not necessary to the correctness of this term, that the place at which the traveller arrives should be his ultimate destination, or the end of his journey. A person going from Richmond to Norfolk, by water, arrives within Hampton Roads, when he reaches that place; or, if he diverges from the direct course, he arrives in Petersburg, when he enters that town. This is, I believe, the universal understanding of the term." *The Patriot,* 1 Brock. 407, 411, 412.

If, as Chief Justice Marshall declared, it is the universal understanding of the term that it designates the fact of "coming to" or "reaching" a place by travelling or moving towards it, and does not require that the place at which the traveller arrives should be his ultimate destination, and consequently that a traveller arrives in a city or town when he enters that city or town, it would seem to follow that "arrival in the State" is complete when the person or the merchandise in question enters the State.

That such is the meaning of the word "arrival," as used in the act of Congress now in question, appears to us to be confirmed by the whole scope and by the obvious purpose of the act.

The act declares and enacts that all intoxicating liquors, "transported into any State or Territory, or remaining therein for use, consumption, sale or storage therein, shall upon arrival in such State or Territory" be subject to the effect and operation of its laws enacted in the exercise of its police powers, to the same extent and in the same manner as though they had been produced in it, "and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise."

The act, in terms, includes all intoxicating liquors "transported into any State or Territory, or remaining therein for use, consumption, sale or storage therein." If it be assumed that the words, "for use, consumption, sale or storage therein," are not restricted to the next preceding clause, "or remaining therein," but also extend back to the earlier clause, "trans-

ported into any State or Territory," still the effect of the words is to cover all intoxicating liquors, transported into or remaining in the State for any possible purpose, except that of being transported through the State to another State or country. All such liquors are "upon arrival in such State" to be subject to the operation and effect of the laws enacted by the State "in the exercise of its police powers," to the same extent and in the same manner as if the liquors had been produced within its limits. And it is expressly provided that intoxicating liquors shall not be exempt from the exercise of the police powers of the State, "by reason of being introduced therein in original packages or otherwise." The phrases "transported into any State," "upon arrival in such State," and "introduced therein," would seem to have been used as substantially equivalent.

The act makes no mention of arrival at a specific destination or place in the State. Its whole object, as appears upon its face, as well as from the circumstances which led to its enactment, is not to define when a particular voyage or transit shall be considered at an end; but to assure to the State, throughout its territorial jurisdiction, the full exercise of its police powers over the subject of intoxicating liquors. And we find nothing in the act to indicate an intention on the part of Congress that the mere fact that intoxicating liquors, brought by a common carrier into the State, have not reached their ultimate destination in the State, or been delivered to the consignee, shall exempt them, after coming within the territorial limits of the State, from the exercise of its police powers.

By the statute of the State of Iowa, under which Rhodes was prosecuted, "if any express company, railway company, or any agent or person in the employ of any express company, or of any common carrier, or any person in the employ of any common carrier, or if any other person shall transport or convey between points or from one place to another within this State, for any other person or persons or corporation, any intoxicating liquors, without first having been furnished with a certificate from and under the seal of the county auditor of

the county to which said liquor is to be transported or is consigned for transportation, or within which it is to be conveyed from place to place, certifying that the consignee or person to whom said liquor is to be transported, conveyed or delivered, is authorized to sell such intoxicating liquors in such county," the company, agent or person so offending shall, upon conviction, be fined in the sum of $100 for each offence; and "the offence herein defined shall be held to be complete and shall be held to have been committed in any county of the State, through or to which said intoxicating liquors are transported, or in which the same is unloaded for transportation, or in which said liquors are conveyed from place to place or. delivered." But it is provided that "the defendant may show as a defence hereunder by preponderance of evidence that the character and circumstances of the shipment and its contents were unknown to him." McClain's Code of Iowa, § 2410. And it was held by the Supreme Court of the State that, in order to support the conviction of Rhodes, it must appear that, when doing the act complained of, he knew that the box in question contained intoxicating liquor.

The material facts, as appearing by the record, and stated in the opinion of the Supreme Court of Iowa, reported 90 Iowa, 496, were as follows:

The intoxicating liquor, which Rhodes has been adjudged guilty of transporting or conveying from one place to another within the State of Iowa, in violation of the statute of the State, was a jug of whiskey, contained and hidden in a wooden box about a cubic foot in size, marked "W. H.," represented to contain groceries, delivered at Dallas in the State of Illinois, by a company doing business at that place, to the Chicago, Burlington and Quincy Railway Company, and consigned to one William Hown at Brighton in the State of Iowa; and was carried, under a through way bill, by that railway company over its road to Burlington in the State of Iowa, and was there transferred to the Burlington and Western Railway Company, whose road was wholly within the State of Iowa, and was carried by this company to Brighton. Upon its arrival at Brighton, it was delivered by the trainmen

upon the platform of this company's depot; and immediately afterwards Rhodes, the company's station agent at Brighton, complying with the directions of his employer, carried the box from the platform into the freight room of the depot building, where, on the same day, it was seized by a constable on a search warrant, being then held by the company for payment of the unpaid freight and for delivery to the consignee. Neither Rhodes nor the company held a permit for the transportation or sale of intoxicating liquors, or a certificate from the county auditor that the consignee was authorized to sell such liquors.

Rhodes testified that before the arrival of the box a mail carrier told him he was looking for a box from Dallas for William Hown, and said it was likely to be marked " W. H.," and would contain alcohol or whiskey; that he told the mail carrier he had not received a box of that description; that the box arrived the next day; and that he supposed, perhaps, this was the box the mail carrier told him would come. The Supreme Court of Iowa was of opinion that this testimony clearly showed that Rhodes knew that the box contained intoxicating liquors; and its conclusion upon this question of fact is not reviewable by this court. *Dower* v. *Richards*, 151 U. S. 658; *Egan* v. *Hart*, 165 U. S. 188; *Turner* v. *New York*, 168 U. S. 90, 95.

Nor does the conclusion of that court, that Rhodes, by moving the box from the depot platform to the freight house, only a few feet off, transported or conveyed the box from one place to another within the State, within the meaning of the statute of Iowa, present any question of law which this court is authorized to review, except so far as the statute, thus construed, may deprive him of a right under the Constitution and laws of the United States.

The intoxicating liquor in question was brought by rail under a through way bill from Dallas in the State of Illinois to Burlington and Brighton in the State of Iowa. It was carried by the Chicago, Burlington and Quincy Railway Company (whose road ran from Illinois into Iowa) to Burlington, and was there delivered to the Burlington and Western Rail-

way (whose road was wholly in the State of Iowa) and was carried by this company to Brighton, and was there delivered by its servants upon the platform of its freight station. Taking into consideration that so much of the transportation as was performed by an interstate railroad company had been accomplished, and that the remainder of the transportation was by an Iowa corporation and wholly within the State of Iowa, and had been so far completed as to land the intoxicating liquor upon the soil of Iowa, we are of opinion that there had been "an arrival in such State," so as to subject the liquor to the exercise of the police powers of the State of Iowa, within the letter and the spirit of the act of Congress.