## FRIEDMAN & CO. v. STATE.

No. 2551.   Opinion Filed April 4, 1913.

(131 Pac. 529.)

1. **ACTION—Right of Action—Illegal Transactions.** The doors of the court are closed to a litigant who founds his action on his own violation of the law.

2. **APPEAL · AND ERROR—Review—Sufficiency of Evidence.** The findings of the trial court on an issue of fact properly submitted to it will not be set aside by the Supreme Court, where the finding is supported by any substantial evidence.

(Syllabus by Brewer, C.)

*Error from Pottawatomie County Court;*
*Ross F. Lockridge, Judge.*

Seizure by the state of Oklahoma of certain whisky, and Friedman & Co., petition to interplead. Petition denied, and from a judgment of confiscation Friedman & Co. bring error. Affirmed.

*Lydick & Eggerman,* for plaintiff in error.
*C. P. Holt, Hunter Johnson* and *Chas. W. Friend,* for the State.

Opinion by BREWER, C.   Forty-eight cases of whisky were seized by the sheriff of Pottawatomie county under a search and seizure warrant in the railroad freighthouse in the city of Shawnee. Friedman & Co. came into the case by interplea and claimed the whisky, and demanded a return thereof, on the ground that it was an undelivered interstate shipment, and that as such it was, at the time of seizure, not subject to the police power of the state. Upon a trial before the county judge the prayer of the interpleader was denied; the court finding from the agreed facts and other evidence that the shipments were made to a fictitious person; that under the arrangements and method of handling the shipments that a delivery into the

warehouse of the carrier was a constructive delivery to the persons who were to actually handle and dispose of the whisky. Upon these findings of fact the court confiscated the whisky; from this judgment of confiscation Friedman & Co. appeal.

The record discloses that the 48 cases of whisky were shipped by appellants from Ft. Smith, Ark., in the names of J. Hall and Jno. Hall, ten cases February 20, twenty cases February 22, and twenty cases February 24, 1911; that a case contains three gallons; that separate bills of lading were issued for each two cases. Thus when a shipment of ten cases was made they would go under five bills of lading, etc. These five bills of lading were sent to a bank in Shawnee with a draft attached to cover the value of the entire ten cases. Each of the bills of lading in a particular shipment would bear the same general shipment number, and accompanying would be inclosed an envelope addressed to shipper at Ft. Smith, with this general shipment number on the back of it, to be used in remitting the proceeds of the drafts.

It is admitted that 450 cases of whisky had been received in the name of John Hall at this depot within the period of 30 days next prior to the shipments in suit, and that no such person as John Hall had ever received personally a single case of the goods, but that a local transfer company uniformly presented the bill of lading and actually received the goods and hauled them away from the depot. As each bill of lading was presented, a statement purporting to be signed by John Hall was filed, stating that the liquor was solely for his and his family's use. These statements to the agent covered an average of ten to fifteen cases of whisky a day. The agent admitted that for a month or two he kept on hand in the freight warehouse an average of 90 cases of whisky at all times to be hauled away as the bills of lading were presented by transfer company. A portion, but not all of these cases, of whisky were shipments from appellants. The shipments in suit had been in the depot from thirteen to seventeen days, but while there other shipments were being taken out and disposed of daily. The

450 cases of whisky handled by the transfer company within the thirty days prior to the seizure involved here "were all delivered in and about Shawnee to individuals." These deliveries of cases of whisky "were made   *   *   *   some of them in the early morning before daylight and some after daylight, and that some were made in the late evening before dark and some after dark."

The question here is: Were these liquors undelivered interstate shipments and protected by the federal laws as such; or were appellants, viewed from the circumstances of the case, the evidence, and inferences naturally flowing therefrom, themselves, through artifice and device, engaged in the unlawful sale of liquors in Shawnee?

1. The court found that John Hall was not a person, and that the consignments to him were to a fictitious consignee. The evidence warranted this finding. The sheriff and a deputy sheriff who had tried to learn of such a man and could find no trace of him testified that they knew of no·such man. Likewise a newspaper man and others. The county judge of the county, who made the finding, lives there, and has lived there for years, ran, and was elected to office. It is inconceivable that a man could do so flourishing a liquor business as appellant claims John Hall was doing, and yet be unknown in a community. He was handling, if appellants' contentions are true, 450 cases of whisky a month; this is 1,350 gallons. It is more than a barrel a day. No such appellation as bootlegger could fit such a trader; he was a wholesaler. If he existed, he must have had numerous customers, some one could surely have been produced who had the doubtful honor of his acquaintance. The banker, who, if appellants' contention is true, received the cash on his drafts and delivered him numerous bills of lading every day, could have easily set the matter of his identity at rest. The transfer man who really received all the shipments and who the depot agent says introduced to him before the whisky enterprise was begun, a man he said was John Hall, could surely have cleared the matter up, but did not. Neither

did anybody claiming to be identified with appellants say there was such a man. Had the learned and well-known attorney representing appellants stated to the court that he had positive knowledge of such a man as John Hall, his word without the. formality of an oath would most likely have sufficed. Considering what was proved, and the significance of what could have been so easily proved, if true, and was not, the court properly found there was no such man, and that appellants were shipping in a. wholesale way these liquors to a fictitious name.

The appellants must have known how their business was being conducted; the remittances through the bank as their goods were taken out under waybills the bank surrendered afforded notice. Our common knowledge teaches us that these dealers would not ship such quantities of merchandise for so considerable a period of time to a fictitious name, and not know how they were being disposed of. The redemption of the waybills also gave notice that the warehouse of the railroad had been converted into and was being used as a place of storage for the liquors to suit the convenience of the trade. The only reasonable inference from all this is that appellants were either. shipping these goods to the transfer company and marking them with a fictitious name for its protection, or they were shipping them there for their own delivery to Shawnee as a place of destination, until orders solicited by their agents could be filled with dispatch by the delivery, of a bill of lading which could entitle the customer to a delivery of the goods. I say one of these explanations is to be legitimately inferred from the facts shown and the circumstances and. situation presented. In either event the appellants were violating the law. If they were knowingly shipping in a fictitious name to shield the real consignee, they violated the laws of the United States. Section 240, Federal Criminal Code 1910. Act March 4, 1909, c. 321, 35 St. at L. 1137 (U. S. Comp. St. Supp. 1911, p. 1662.)

If they were shipping for their own delivery, they were violating the state law against the sale of liquors, and in either event their cause of action (interplea) is founded upon and grows out

of their own unlawful acts, and under well-settled rules the doors of the court are, as they ought to be, closed against them. *Haley & Co. v. State,* 34 ·Okla. 300, 125 Pac. 736; *Blunk v. Waugh,* 32 Okla. 616, 122 Pac. 717, 39 L. R. A. (N. S.) 1093, and cases cited. We are well aware of the holdings of this court relative to interstate shipments and the necessity for a delivery of the goods to customer (*State v. Eighteen Casks of Beer,* 24 Okla. 786, 104 Pac. 1093, 25 L. R. A. [N. S.] 492; *St. L. & S. F. Ry. Co. v. State,* 26 Okla. 300, 109 Pac. 230; *G., C. & S. F. Ry. Co. v. State ex rel. Caldwell,* 28 Okla. 754, 116 Pac. 176, 35 L. R. A. [N. S.] 456, following the Supreme Court of the United States in *Rhodes v. Iowa,* 170 U. S. 412, 18 Sup. Ct. 664, 42 L. Ed. 1088, 1096; *Heymann v. So. Ry. Co.,* 203 U. S. 270, 27 Sup. Ct. 104, 51 L. Ed. 178; 7 Ann. Cas. 1130; *Adams Express Co. v. Kentucky,* 206 U. S. 129, 27 Sup. Ct. 606, 51 L. Ed. 987, and other cases); but the case at bar is rested on the proposition that the evidence and natural inferences to be drawn from it, and the surrounding circumstances, justify the conclusion that the appellants were through devices and artifice violating the laws of the state by selling liquors in the city of Shawnee, and of the United States by shipping liquors from out the state into it to a fictitious consignee.

The cause should be affirmed.

By the Court: It is so ordered.