LEHIGH VALLEY R. CO. v. UNITED STATES.

PHILADELPHIA & R. RY. CO. v. SAME.

BETHLEHEM STEEL CO. v. SAME.

(Circuit Court of Appeals, Third Circuit.    June 13, 1911.)

Nos. 21, 22, 23.

1. CARRIERS (§ 30*)—INTERSTATE COMMERCE ACT—SCHEDULES OF RATES—"TERMINAL CHARGE"—DEMURRAGE—"TRANSPORTATION."

Demurrage charged for the detention of cars in loading or unloading is a terminal charge, required to be shown by the schedules of rates filed and published by an interstate railroad company by the terms of the interstate commerce act of February 4, 1887, c. 104, §§ 1, 6, 24 Stat. 379, 380 (U. S. Comp. St. 1901, pp. 3154, 3156), as subsequently amended by Act June 29, 1906, c. 3591, §§ 1, 2, 34 Stat. 584, 586 (U. S. Comp. St. Supp. 1909, pp. 1150, 1153), which define transportation as including all the instrumentalities and facilities of shipment and all services in connection with the receipt, delivery, and handling of property transported, and require the filing and publishing of schedules showing all the rates, fares, and charges for transportation, stating separately all terminal charges.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 81; Dec. Dig. § 30.*

For other definitions, see Words and Phrases, vol. 8, pp. 7075–7076.]

2. CARRIERS (§ 38*)—VIOLATION OF INTERSTATE COMMERCE ACT—DEMURRAGE CHARGES.

Any departure by an interstate railroad company from the demurrage charges fixed by its filed and published schedules constitutes a misdemeanor under the Elkins act of February 19, 1903, c. 708, § 1, 32 Stat. 847 (U. S. Comp. St. Supp. 1909, p. 1138).

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 96, 97; Dec. Dig. § 38.*]

3. CARRIERS (§ 38*)—PROSECUTION FOR GIVING CONCESSION IN VIOLATION OF INTERSTATE COMMERCE ACT—DEFENSES.

That demurrage charges fixed by the rate schedules of interstate railroad companies in a certain district were discriminatory as between a shipper located in such district and competitors placed in other districts and governed by different rates is no defense to a prosecution of a railroad company or the shipper for granting or receiving a concession by a cancellation of such charges, the only legal mode of correcting the discrimination being by a change in the schedules on proper notice or under authority from the Interstate Commerce Commission.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 38.*

What constitutes an unlawful preference or discrimination by a carrier under interstate commerce regulations, see note to 94 C. C. A. 230.]

In Error to the District Court of the United States for the Eastern District of Pennsylvania.

Criminal prosecutions against the Lehigh Valley Railroad Company the Philadelphia & Reading Railway Company, and the Bethlehem Steel Company. From a judgment of conviction in each case, the defendants bring error. Affirmed.

For opinions below, see 184 Fed. 543, 546.

John G. Johnson, for plaintiffs in error.

J. W. Thompson, for the United States.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Before LANNING, Circuit Judge, and YOUNG and McPHER-SON, District Judges.

YOUNG, District Judge. All the defendants were indicted under the acts of Congress regulating commerce, as amended by the act of February 19, 1903, known as the "Elkins Act," and as amended by the act of June 29, 1906, known as the "Hepburn Act," in the following indictments:

The Lehigh Valley Railroad Company, hereinafter called the Lehigh, at No. 23 and No. 24, March sessions, 1910. At No. 23 in 97 counts for failure to observe the tariff in force from April 1, 1907, by canceling and remitting the demurrage charges upon 97 different cars delivered in interstate commerce by the Lehigh to the Bethlehem Steel Company, hereinafter called the Steel Company; and at No. 24 in 58 counts, in the 29 odd-numbered counts (from 1 to 57 thereof) in granting a concession of one day's free time in excess of the 48 hours' free time specified in the tariff filed and then in force, whereby the demurrage charge was reduced by $1 on each car, with respect to 29 different cars delivered to the Steel Company between October 1, 1907, and November 12, 1907, and in the 29 even-numbered counts (from 2 to 58, inclusive) with failure to observe the tariff in force as to the cars set out in the odd-numbered counts.

The Philadelphia & Reading Railway Company, hereinafter called the "Reading," was indicted at No. 25 and No. 26, March sessions, 1910. At No. 25 in 63 counts for failure to observe the tariff then in force by canceling and remitting the demurrage charge on 63 different cars delivered to the Steel Company between April 1, 1907, and October 9, 1907; and at No. 26 in 24 counts, in the odd-numbered counts (from 1 to 23, inclusive), with granting a concession of one day's free time in excess of the 48 hours specified in the tariff, whereby the demurrage charge was reduced by $1 on 12 different cars delivered to the Steel Company between October 9 and October 24, 1907, and in the 12 even-numbered counts (from 2 to 24, inclusive), with a failure to observe the tariff in force as to the cars set out in the odd-numbered counts.

The Bethlehem Steel Company was indicted at No. 33 and No. 34, March sessions, 1910. At No. 33, with soliciting and receiving the concessions from the Reading specified at No. 25; and at No. 34, with soliciting and receiving the concessions from the Lehigh specified at No. 23.

By agreement of counsel the six indictments were tried together, and the jury returned a general verdict of guilty upon each of the indictments, and the defendants were respectively sentenced by the court in the first count of each indictment to pay a fine of $20,000; the Lehigh on the first counts of No. 23 and No. 24, the Reading on the first counts of No. 25 and No. 26, and the Steel Company on the first counts of No. 33 and No. 34. At the trial, as shown by the record, there was no dispute as to the cars, as to the amount of the demurrage on each car, or the time when it accrued, or the aggregate

amount charged as having accrued and been canceled and remitted. The record also shows the following facts as undisputed:

During the period covered by the indictments, the Lehigh and the Reading were members of the Northeastern Car Service Association, hereinafter called the "Association," composed of certain railroads engaged in interstate commerce, and operating within a certain territorial division of northeastern Pennsylvania. The Steel Company was also within this territory. The Association, through its Car Demurrage Bureau, hereinafter called the "Bureau," had charge of the business of supervising the application of the demurrage rules, auditing demurrage accounts, and adjusting claims for improper demurrage charges collected by the railroad companies within its territory. This was accomplished by the freight agents of the different railroads reporting to the manager of the Bureau the arrival, placing, and release of cars subject to demurrage rules. The freight agents also reported to the accounting departments of their respective companies, and under the supervising of the manager of the Bureau collected the earnings for the companies in accordance with the tariffs and rules on file with the Interstate Commerce Commission, and it was the duty of the manager of the Bureau to see that these tariffs and rules were observed and carried out. The Association adopted uniform rules for demurrage charges which applied to all the railroads within its territory. After the Hepburn act went into effect in August, 1906, the Association adopted car service rules, and on August 27, 1906, the Lehigh filed with the Interstate Commerce Commission these rules as its original tariff of charges for demurrage in the transportation of freight within the Association's territory, and on November 23, 1906, the Reading filed the same rules, and by those rules it was provided that a charge of $1 per day should be made "for car service and use of track on all cars not unloaded within 48 hours after arrival, not including Sundays and legal holidays, the time to be computed from 7 a. m. of the following day on cars arriving after 7 a. m., and from 12 noon of the following day on cars arriving after 12 noon." While these rules were in effect, the Lehigh and Reading, the former on August 27, 1907, and the latter on August 26, 1907, filed new rules, marked, respectively, 2208 and 200, with the Interstate Commerce Commission, which were to take effect on October 21, 1907, and which, when effective, would cancel the rules then in force. The only material change was that the 48 hours' free time was to be computed in every case from 7 a. m. of the day following the arrival of the car instead of from 7 a. m. and 12 noon, respectively.

It appears the Association then adopted rules on October 9, 1907, by which the 48 hours' free time should not only be computed from 7 a. m. of the day following placement, but that industrial plants performing their own switching would have an additional allowance of 24 hours for switching. This rule, marked "Supplement No. 1 to Lehigh Tariff," was filed with the Interstate Commerce Commission by the Lehigh on October 10, 1907, to become effective November 12, 1907, and by the Reading on September 21, 1907, marked "Supplement No. 1 to the Reading Tariff," and to become effective on

October 24, 1907. On October 9, 1907, the first vice president of the Lehigh and the general manager of the Reading notified Thomason, the manager of the Association, and under his protest, that the rule allowing 24 hours' additional free time to those plants doing their own switching, and which would not become effective as to the Lehigh until November 12, 1907, and as to the Reading until October 24, 1907, would be put into effect October 9, 1907, thus giving 24 hours' additional free time to the Steel Company from October 9, 1907.

On April 15, 1908, the Car Service Association adopted what were known as the "National Car Service Rules," which by an order filed by the Reading as order 578 became effective May 15, 1908, and canceled the rules theretofore in effect. The same rules were put into effect June 15, 1908, by the Lehigh by a tariff marked "Supplement No. 2 to Tariff 2208," which superseded the previous rules.

The evidence shows that the outstanding demurrage bills from January, 1901, to August, 1906, owing by the Steel Company to the Lehigh, were $26,539, and to the Reading, $23,424. These amounts were canceled on the ground that they were incorrect and the records unreliable, but as they accrued before the Hepburn act they were not made the subject of indictment. From September, 1906, after the Hepburn act became effective, to June 1908, exclusive of the period from April 1, 1907, to October 9, 1907, demurrage charges had accrued from the Steel Company to the Lehigh amounting to $44,125, and from the Steel Company to the Reading amounting to $29,275.

On May 15, 1907, the Reading demurrage charges against the Steel Company were transferred from the Northeastern Association to the Philadelphia Association, and on June 15, 1907, the Lehigh demurrage charges were transferred from the Northeastern Association to the Philadelphia Association. It appears from the evidence that from time to time prior to July 24, 1908, the manager of the Bureau and the Lehigh and Reading had requested payment of the demurrage charges from the Steel Company, and finally on July 24, 1908, the manager of the Association wrote the Lehigh and the Reading that the demurrage charges had been reduced from $73,400 to $7,391; the Lehigh from $44,125 to $4,284, and the Reading from $29,275 to $3,107.

In August, 1908, the manager of the Association notified the Steel Company of the adoption of the car service rules and that the same had been made retroactive as to the Steel Company, and agreed under authority of the Lehigh and Reading to settle all demurrage bills against the Steel Company, reducing the Lehigh charges from $44,125 to $4,284, and the Reading from $29,275 to $3,107. On December 4, 1908, the Steel Company paid to the Lehigh the sum of $4,284 by its check to the order of the Lehigh, and to the Reading $3,107, by its check to the order of the Reading. It clearly appears from the evidence that there was included in this settlement all demurrage charges accrued from the Steel Company to the Lehigh and Reading from September, 1906, to June, 1908, except for the months of April, May, June, July, August, and September and to October 9, 1907.

An inspection of the indictments shows that the charges set out in indictment 24 against the Lehigh, and in indictment 26 against the

Reading, were for the cancellation of charges included in the settlement of December 4th. It was found that the charges for the period from April 1, to October 9, 1907, which were assumed to have been in the settlement of December 4th, were not included, and on December 10, 1908, the manager of the Association recommended to the Lehigh a cancellation of the Lehigh charges therein stated to be $40,611, for the period from April 1 to October 9, 1907, to which the Lehigh answered December 23, 1908, approving such cancellation and on December 29, 1908, these charges were canceled. It also appears from the evidence that the demurrage charges due by the Steel Company to the Reading were $15,635 for the period from April 1 to October 9, 1907, and that these were recommended for cancellation by Fraser, the inspector of the Association, in his letter to Challenger, included in which was his analysis showing the complete cancellation of the charges. The evidence also shows that no effort has since been made to collect these charges and that they were abandoned. An inspection of indictment No. 23 against the Lehigh and No. 25 against the Reading shows that they were based upon demurrage charges accruing from the Steel Company between April 1, 1907, and October 9, 1907, and which it is alleged were settled December 29, 1908. The two indictments, 33 and 34, against the Steel Company, were for receiving these cancellations from the Lehigh and the Reading respectively.

All the foregoing facts were either admitted during the trial or are abundantly proved by the evidence submitted by the government.

It thus appears that the Lehigh and Reading were engaged as common carriers in transporting property for the Steel Company in interstate commerce, and that certain rules had been adopted by the railroads governing the demurrage charges, and that these were filed with the Interstate Commerce Commission, and that they were well known to the Steel Company. It also appears that beginning in January, 1901, and up to June, 1908, charges in favor of the Lehigh had accrued from the Steel Company to the amount of $113,360, and to the Reading to the amount of $68,263, and although demand had been made from time to time upon the Steel Company for the payment of all of these charges, they had not been paid. During the summer of 1908, the Lehigh and Reading, through the manager of the Association, took up with the Steel Company the settlement of these charges and the evidence clearly shows that the Steel Company was soliciting the cancellation, and that the Lehigh and Reading were endeavoring to make a settlement satisfactory to the Steel Company. There cannot be a particle of doubt under the evidence that after these charges had accrued the railroads on the one hand and the Steel Company on the other were endeavoring to effect a settlement by which the charges would be canceled. With this end in view the railroads first canceled all the charges accruing before the passage of the Hepburn act and up to September, 1906. They then attempted to cancel all the charges from September, 1906, to June, 1908, and on December 4, 1908, they finally settled all the charges of which they had knowledge at that time, and this they accomplished, first, by assuming that the change in the rules, which they had attempted to make

on October 9, 1907, without the 30 days' notice required by the act, was legal and effective, and by making the rules subsequently adopted retroactive, and by making certain allowances for conditions about the railroads and Steel Company not in any sense provided for by the rules and tariffs in force.

Immediately after the settlement of December 4, 1908, certain accounts of demurrage for the period from April 1st to October, 1907, which had been overlooked, were discovered, and thereupon the Lehigh, upon December 29, 1908, canceled these charges for that period, and as to the Reading the inspector of the Association recommended to the manager of the Association that these charges for that period were caused by the fault of the Reading and should not have been charged. No effort was ever made by the Reading to collect these charges, and the jury had sufficient evidence upon which to find that the Steel Company had demanded their cancellation and that the Reading had made the cancellation.

The cases were tried upon the theory that the railroads and the Steel Company had the right to adjust the demurrage charges, and the defendants insisted that the demurrage charges had been entered up against the Steel Company wrongfully, and that the Steel Company had consistently and persistently refused to pay them, and that finally the railroads having investigated the charges found that they had wrongfully charged the Steel Company, and that the adjustment was finally agreed upon by the railroads and the Steel Company, which was satisfactory to both, and which resulted in the cancellation set out in the indictment. It was contended by the government that the charges were correct and in accordance with the tariffs filed by the railroads, and that the railroads in making the settlement were seeking to make concessions demanded by the Steel Company under the guise of a settlement of disputed charges.

The court submitted to the jury, as bearing upon the guilt of the defendants, the question of fact raised by the evidence in order to determine whether the settlement was an honest correction of mistakes in the charges, or a means of granting and receiving concessions. The jury evidently found that the settlement was the means of granting concessions, and not the correction of honest mistakes, for they found the defendants guilty.

These cases may be disposed of by considering the numerous assignments of error as raising the following questions: (a) Do the acts regulating commerce require rules, tariffs, and schedules relating to demurrage charges to be filed with the Interstate Commerce Commission? (b) Can there be a prosecution for the violation of such rules, tariffs, and schedules? (c) Was there any error in the charge of the court?

[1] (a) That the commerce act requires that every common carrier engaged in interstate commerce shall file with the Interstate Commerce Commission, and publish and keep open for public inspection, all rates, fares, and charges, stating separately all terminal charges, and that such terminal charges include demurrage charges, is established (1) by the words of the act; (2) by the decisions of the In-

terstate Commerce Commission; and (3) by the rulings of the federal courts.

(1) Section 1 of the act to regulate commerce of February 4, 1887, as amended by subsequent acts, defines transportation as including, "all the instrumentalities and facilities of shipment or carriage * * * and all services in connection with the receipt, delivery, elevation, and transfer in transit, ventilation, refrigeration or icing, storage, and handling of property transported." Section 6 of the act of 1887, as amended by the act of 1889 and by the act of 1906, provides:

"That every common carrier subject to the provisions of this act shall file with the Commission created by this act and print and keep open to public inspection schedules showing all the rates, fares and charges for transportation."

The section further provides that the schedules "shall also state separately all terminal charges, storage charges, icing charges, and all other charges which the Commission may require, all privileges or facilities granted or allowed, and any rules or regulations which in any wise change, affect or determine any part or the aggregate of such aforesaid rates, fares and charges, or the value of the service rendered to the passenger, shipper, or consignee."

Thus we see that by the language of the act transportation is defined to include terminal charges. It must be conceded that demurrage, being a charge for the detention of a car because of the use of the car and track until unloaded, is a terminal charge.

(2) It has been uniformly held by the Interstate Commerce Commission that demurrage charges are part of transportation, and are required to be filed with the Commission. "Beyond all possibility of doubt, therefore, the duty of regulating terminal charges when related to interstate transportation has been lodged with the Interstate Commerce Commission, and federal courts have so held." Wilson Produce Co. v. Pennsylvania R. R. Co., 14 Interst. Com. R. 170, 174. "It does not appear to be necessary to do more than refer to the decision of the Commission in Wilson Produce Co. v. P. R. R. Co., 14 Interst. Com. R. 170, in which it was held that the duty of regulating terminal charges, when related to traffic between states, has been lodged with the Commission, and cases therein cited." Peale, Peacock & Kerr v. C. R. R. of N. J., 18 Interst. Com. R. 25, 33.

(3) The federal courts have so held. In Michie v. New York, N. H. & H. R. Co. (C. C.) 151 Fed. 694, Judge Lowell said:

"The phrase of the statute 'delivering, storage or handling' is broad enough to include demurrage."

In United States v. Standard Oil Company (D. C.) 148 Fed. 719, 722, Judge Landis said:

"The law requires the published tariff to show everything in the way of terminal regulations which in any way affects the cost of the service rendered by the carrier, and such published terminal charge is no less binding on the parties than is the tariff specified for the transportation." In Interstate Commerce Co. v. Detroit, etc., Ry. Co., 167 U. S. 633, 17 Sup. Ct. 986, 42 L. Ed. 306, Mr. Justice Shiras said on page 645 of 167 U. S., page 990 of 17 Sup. Ct.: "It may well be doubted whether cartage, when furnished without charge, comes within the meaning of the phrase 'terminal charges,' or can be regard-

ed as 'a rule or regulation,' which in any wise 'changes, affects, or determines' any part or the aggregate of the rates, fares, and charges."

And after discussing the opinion of Judge Cooley and the report of the Interstate Commerce Commission continues:

"However, in a matter of this kind, much should be left to the judgment of the Commission, and should it direct, by a general order, that railway companies should thereafter regard cartage when furnished free as one of the terminal charges, and include it as such in their schedules, such an order might be regarded as a reasonable exercise of the Commission's powers."

To the same effect is Rhodes v. Iowa, 170 U. S. 412, 18 Sup. Ct. 664, 42 L. Ed. 1088, where the present Chief Justice held that the moving of goods from the platform to the freight warehouse was a, part of interstate commerce transportation. Bowman v. Chicago, etc., Railway Co., 125 U. S. 465, 8 Sup. Ct. 689, 1062, 31 L. Ed. 700; McNeill v. Southern Railway Co., 202 U. S. 543, 26 Sup. Ct. 722, 50 L. Ed. 1142. The railroad companies, the defendants in these cases, so regarded them and filed them with the Commission. To hold otherwise than that demurrage is part of transportation and part of the terminal charges would be to open the door to a railroad company to allow favored patrons to occupy the tracks and the cars for such demurrage charges as they chose. Transportation includes the hiring of the vehicle and the hauling of it to its destination. The rates are based to some extent upon the time the car is used and out of service to the railroad company, because if not unloaded it is still in use. It is not a penalty. In the ordinary use of a car the time of the journey measured by miles is calculated and considered as well as the cost of moving it in fixing the charges. When the journey is finished of course the cost of moving ceases, but the use of the car remains. The aggregate of the rates is therefore affected and clearly comes within the Hepburn act.

[2] (b) The tariff having been filed and published not to observe it is a misdemeanor. In Texas & Pacific Ry. Co. v. Abilene Cotton Oil Co., 204 U. S. 426, 27 Sup. Ct. 350, 51 L. Ed. 553, Mr. Justice White said:

"Thus, by section 1 of the act approved February 19, 1903, commonly known as the 'Elkins Act,' which, although enacted since the shipments in question, is yet illustrative, the willful failure upon the part of any carrier to file and publish 'the tariffs or rates and charges,' as required by the act to regulate commerce and the acts amendatory thereof, 'or strictly to observe such tariffs until changed according to law,' was made a misdemeanor, and it was also made a misdemeanor to offer, grant, give, solicit, accept, or receive any rebate from published rates or other concession or discrimination. And in the closing sentence of section 1 it was provided as follows: 'Whenever any carrier files with the Interstate Commerce Commission or publishes a particular rate under the provisions of the act to regulate commerce or acts amendatory thereof, or participates in any rates so filed or published, that rate as against such carrier, its officers or agents in any prosecution begun under this act, shall be conclusively deemed to be the legal rate, and any departure from such rate or any offer to depart therefrom shall be deemed to be an offense under this section of the act.'"

If, therefore, the terminal charges are part of the transportation, and if demurrage charges are included in the term "terminal charges," then clearly the failure to observe these tariffs and the soliciting and

receiving of concessions are misdemeanors for which a prosecution will lie.

[3] (c) Was there error in the charge of the court? The whole case turns upon whether or not the settlement was an honest settlement or one made for the purpose of allowing the cancellation of demurrage. The division of territory by which the Steel Company was put in one district and its competitors in another, the demurrage charges for the Steel Company not being as favorable as for others, its competitors, and were therefore discriminatory, cannot affect the case. If the charges were discriminatory, that matter could be rectified by an appeal to the Interstate Commerce Commission, or by making changes in the rules in accordance with the laws giving 30 days' notice, or such other notice as was required by the Interstate Commerce Commission, the authority resting in that Commission alone to grant a change of rules on less than 30 days' notice.

It is to be observed that the charges of concessions made by the railroads to the Steel Company, and which are made the subject of indictment, had accrued before any change was made in the rules. No concession is set forth in the indictment of a later date as to the Lehigh than October 23d, and as to the Reading, than October 18th, and yet no offer was made to change the rules until October 9th. But it is argued by counsel for plaintiff in error that:

"There was no evidence as against the Steel Company to sustain the averment that from either railroad company it did unlawfully, knowingly, and willfully solicit and receive a concession or a certain sum upon the amount of a demurrage charge by it due and payable."

This turns upon the knowledge and intent of the Steel Company in soliciting and receiving. It must be conceded it demanded the reduction of the charges and received it. Its contention was based upon the knowledge of the demurrage charges, and its refusal was based upon many conditions as to railroad tracks being torn up and the Steel Company's tracks being in a bad condition. But no allowance could be made for these things unless they were allowed by the Commission. In Texas & Pacific Ry. v. Abilene Cotton Oil Co., supra, Mr. Justice White said:

"Concluding, as we do, that a shipper seeking reparation predicated upon the reasonableness of the established rate must, under the act to regulate commerce, primarily invoke redress through the Interstate Commerce Commission, which body alone is vested with power originally to entertain proceedings for the alteration of an established schedule, because the rates fixed therein are unreasonable, it is unnecessary for us to consider whether the court below would have had jurisdiction to afford relief if the right asserted had not been repugnant to the provisions of the act to regulate commerce."

To the same effect is Baltimore & Ohio R. R. v. Pitcairn Coal Co., 215 U. S. 481, 30 Sup. Ct. 164, 54 L. Ed. 292. The rates were fixed by the tariff filed and could not be departed from. The law did not intend that the railroad and shipper could alter these charges, because that would do away altogether with the purpose sought by the act. It was known by the Steel Company what the charges were, and the law was violated by reducing those charges by the settlement between the railroads and the Steel Company, thus allowing the carrier and

the shipper to determine in each case whether the tariff should be observed or not.

Again, it is argued that there was not any settlement at all of certain demurrage charges specified in the counts upon which sentence was imposed. Under the first indictment, No. 23, the charges were based upon different transactions, different cars as to the Lehigh. The same is true as to indictment No. 25 as to the Reading. Settlement for these transactions was made December 29, 1908. Bethlehem received by this settlement, which it had demanded through its correspondence, the concessions included in the settlement. It clearly appears from the evidence that this settlement of December 29, 1908, included all demurrage charges from April 1, 1907, to October 9, 1907, and this carries with it indictment 33, based on indictment 25 of the Reading, and indictment 34, based on 23 of the Lehigh. This was a distinct settlement from the settlement of December 4, 1908, which included all charges from September, 1906, to June, 1908, except those from April to October, 1907.

We find no error in the charge. The case, as has been said, was tried upon the theory that, if the settlement was an honest one, the defendants were not guilty, and the court submitted it to the jury fully and fairly upon this theory. This was a more favorable view of the case than defendants were entitled to have presented to the jury under the facts of this case. If the rates were discriminatory they could be changed, and changed alone by an application to the Interstate Commerce Commission. If the conditions were such as to make the charges unjust, proper application could have been made, and made only to the Interstate Commerce Commission for an adjustment of the charges, but the Lehigh and the Reading being a law unto themselves changed the rules which were in force and applied them without the notice required by the act as to a portion of the charges, and made them retroactive as to others.

Under all the evidence in this case, the railroads and the Steel Company have violated the law, and they are clearly proved to have been guilty under the law as charged in the several indictments.

The judgments are affirmed.