NEBRASKA TRANSFER COMPANY, APPELLEE, v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, APPEL-LANT.

FILED JANUARY 3, 1912. No. 16,581.

1. **Railroads: DEMURRAGE.** A railroad company engaged in interstate commerce may charge and collect demurrage or car service charges in accordance with its tariff schedules, rules and regulations, filed with and approved by the interstate commerce commission, on cars used in interstate shipments, where the consignee fails to unload and release them within 48 hours, free time, after notice of arrival and tender of the shipments to such consignee, or the one charged with the duty of unloading such cars.

2. ———: ———. The fact that neither the consignee nor the one charged with the duty of unloading is able to receive and unload the cars within 48 hours, free time, after notice of their arrival will not relieve the consignee of the obligation to pay such service charges.

3. **Trial: DIRECTING VERDICT.** Where the evidence on the trial in the district court is not conflicting, and reasonable minds cannot differ as to the conclusion to be derived therefrom, it is the duty of the court, when requested, to direct a verdict in accordance with such conclusion.

APPEAL from the district court for Douglas county: GEORGE A. DAY, JUDGE. *Reversed.*

*James E. Kelby* and *Arthur R. Wells*, for appellant.

*T. W. Blackburn, contra.*

BARNES, J.

Action to recover demurrage charges collected from the plaintiff on certain cars of sugar transported by the defendant railroad company from refineries located in states other than Nebraska, consigned to and received by

the Russell Brokerage Company at Omaha, in the months of October and November, 1907.

It appears that the plaintiff, the Nebraska Transfer Company, had the contract for unloading and storing the sugar, and paid the charges in question, which it claims were unlawfully exacted, and thereafter brought this action to recover the money so paid. The petition alleged the corporate capacity of the plaintiff and the defendant, and the facts upon which the recovery was sought were stated therein, as follows: "(5) That in the performance of its obligations to its customers, being the consignees of the said Chicago, Burlington & Quincy Railroad Company, it did at divers times receive from the Chicago, Burlington & Quincy Railroad cars loaded with freight to the number of 56, and did with all speed unload said 56 cars from the track and switches of said defendant corporation. But that the said defendant corporation, without any authority of law, as a condition of the delivery of the cars to this plaintiff, required this plaintiff to pay to the defendant the sum of $409 in excess of the freight charges claimed by the defendant to be the just and proper charges, based upon the legal and established rate and classification under schedules published by said defendant; said defendant representing to said plaintiff that said sum of money, to wit, $409, was due and owing from this plaintiff to the defendant as demurrage on said cars, the said defendant well knowing that no such sum, or any part thereof, was due from this plaintiff to the said defendant, and the said defendant, with the purpose of creating a claim or liability for said demurrage, failed and neglected to deliver to said plaintiff the cars as they were received from the consignor by the defendant, so that the plaintiff should have to unload not to exceed two cars per day, but, instead, forced upon this plaintiff from 7 to 12 cars per day and within such short intervals as to make it impossible for this plaintiff to unload all of said cars within 48 hours after their arrival in Omaha."

The defendant, by its answer, admitted the introductory paragraphs of the petition, and further admitted that the plaintiff was entitled to receive and have a refund of the demurrage charges assessed upon certain cars, which were described by numbers in the answer, amounting to $12 in all, which sum the defendant offered and tendered to pay to the plaintiff before the action was begun, and offered to confess judgment in plaintiff's favor for that amount. The defendant's answer to paragraph 5 of the petition, which is quoted above, admitted that it did at divers times receive and transport over its lines and deliver to the plaintiff cars loaded with freight, and that it collected from the plaintiff demurrage or car service charges upon certain of said cars, which demurrage or car service charges were the legal and usual charges therefor, and were justly and lawfully due and owing to the defendant upon said cars from the consignees thereof, except the sum of $12, and denied each and every other allegation contained in that paragraph, except those expressly admitted. Defendant also denied each and every of the allegations contained in the petition, other than those expressly admitted, and specially denied that it owed the plaintiff the sum of $409, or any other sum, except the said sum of $12. For further answer, the defendant challenged the jurisdiction of the court by suitable and proper allegations, which were, in substance, that it was a common carrier engaged in interstate commerce, and owned and was operating a line of railroad between points in the state of Nebraska and points in the states of Colorado, Iowa, Illinois, and other states, and alleged that as such common carrier it was subject to the act of congress approved February 4, 1887, entitled "An act to regulate commerce," and the acts amendatory thereof and supplemental thereto; that all of the shipments mentioned in the plaintiff's petition were interstate shipments, and were transported from points outside of the state of Nebraska to the city of Omaha, in the state of Nebraska; that the rates of charges and the

terms and conditions upon which the shipments were received and transported by the defendant, and the amount of the demurrage or car service charges that should be assessed thereon, and the terms and conditions upon which they were assessed, became due, were fixed and determined by the tariffs, rules and classifications of the defendant which had been published and filed with the interstate commerce commission at and before the time said shipments were received and transported; that the rights of common carriers and shippers in such cases were regulated and determined by the acts of congress relating to interstate commerce; that by said acts of congress the interstate commerce commission is vested with sole and exclusive jurisdiction to hear and determine the complaint made by the plaintiff in this action, and to award reparation therefor, in case it should appear that said charges were not legally assessed and collected, and this court and the courts of the state of Nebraska have no jurisdiction to hear and determine this controversy.   Defendant prayed for a judgment against the plaintiff for costs.

Upon the issues thus joined, the cause was tried to a jury in the district court for Douglas county.   At the close of all of the evidence, defendant moved the court to direct a verdict for the plaintiff for $12, for which sum the defendant had theretofore offered to confess judgment.   The motion was overruled, and the defendant excepted.   The cause was then submitted to the jury, and a verdict for the plaintiff for $170.24 was returned. Judgment was rendered thereon, and the defendant has appealed.

It is contended that the evidence does not sustain the judgment, and therefore the district court erred in overruling the defendant's motion to direct the verdict.   The record discloses that on the trial the plaintiff abandoned the right of recovery on all but six cars of sugar, which it was contended defendant negligently placed and allowed to remain upon a certain storage track in order to

create a demurrage or service charge against the plaintiff.

The evidence on which plaintiff relied for a recovery and to support the judgment was given by its president, and is quoted in its brief as follows: "Q. With these exhibits before you, and any other papers that you may have to refresh your recollection, can you state when these cars were delivered to you, or notice given you that they were ready? A. Yes, sir. Q. You may state when. A. They were delivered on the team tracks of the Burlington on the 26th day of November, 1907. Q. How soon were they unloaded? A. They were unloaded the following day. They were either unloaded or reconsigned. They may not have been all unloaded the following day. Q. They were disposed of as far as you were concerned? A. Yes, sir. Q. Have you ever been refunded any part of this $109? A. No, sir. Q. Calling your attention to the Rock Island car No. 30,695, have you any personal recollection with reference to that car, Mr. Magaret? A. Yes, sir. Q. What is it? A. That car was never unloaded here, but it was reconsigned. It was sent to Rochester, Minnesota. Q. Did you pay any demurrage on that car? A. The refineries paid $31 on it, and it was charged back to our account and deducted at the time of settlement. Q. Did you pay that $31? A. Yes, sir. Q. You may relate when you received notice that that car was available to you. A. We reconsigned that car immediately upon being advised that it had arrived. Q. State to the jury what you mean by reconsigned. A. Shipped it on. Billed it out and shipped it to Rochester, Minnesota. Q. Have you ever been refunded that $31? A. No, sir.

As opposed to this testimony, it was shown by the defendant, without dispute, that notice of the arrival of each one of the cars in question, including car No. 30,695, was given by telephone to the Russell Brokerage Company, the consignee, on the day they arrived in Omaha. As to car No. 30,695, John Holmes, who was the chief

clerk in the defendant's freight office at Omaha, testified that on October 28, 1907, notice was given by him by telephone to the Russell Brokerage Company, the consignee, that the car had arrived, and this was followed at once by a postal card notice of that fact. It appears that plaintiff had a private track and warehouse situated upon the Union Pacific road, where it was engaged in unloading and storing cars of sugar for the consignee. Witness Holmes further testified that that car was at once delivered to the Union Pacific Railroad Company to be placed on plaintiff's private track; that it was returned to the defendant because the plaintiff's track was full of cars which they were then engaged in unloading, and it could not be placed thereon. The defendant then attempted to place the car on what is called the "team track," where the plaintiff was also engaged in unloading cars of sugar, but that track was full, and it was impossible to place the car there; that defendant was then compelled to place the car on its storage track; that when plaintiff was in condition to receive it, which was on the 28th day of November, 1907, it was then placed on the team track; that it was not unloaded at Omaha, but was then reconsigned and forwarded to Sioux City. This testimony was not disputed by any one, and its truthfulness is not challenged.

As to the other five cars, defendant's witnesses testified that notice was given both by telephone and by postal card to the brokerage company at the time each car arrived in Omaha; that they were then delivered to the Union Pacific company to be placed on plaintiff's private track for unloading; that the track was full of other cars which plaintiff was engaged at that time in unloading, and there was no room upon their private track for them; that thereafter the cars were immediately returned by the Union Pacific Railroad Company to the defendant; that the defendant at once attempted to place them upon its team track, where the plaintiff was also engaged in unloading and storing car-loads of sugar for the brok-

erage company; that the team track was full, and the
cars could not be placed upon it; that thereupon they
placed them with car No. 30,695 upon the storage track,
and they remained there until the plaintiff was ready to
receive and unload them, when they were promptly
placed upon the team track. . This testimony is also un-
disputed, and its truthfulness is in no manner challenged.

The record further discloses that Mr. Magaret, the
president of the plaintiff company, upon his cross-exam-
ination testified as follows: "Q. The way you handled
this sugar business ordinarily would be to have the cars
delivered on your private side-track at your warehouse,
would it not? A. We. had some delivered there and
some delivered on the team tracks. Q. Until your pri-
vate side-track was filled with cars and no more could be
sent there, did you undertake to unload any cars on the
team track? A. It was not a matter of our tracks being
full at the warehouse, it was a matter of not having room
at the warehouse, so we rented another warehouse that
was not on the tracks, and because of the team tracks be-
ing near by that warehouse we had the cars set there. Q.
During all this period of which you have been testifying,
while this demurrage was accruing, did you have your full
force working unloading cars? A. Yes, sir. Q. Were
there enough cars of sugar on the team tracks all the
time to keep your forces all busy? A. Well, I do not
know what you mean by all the time. Q. I do not mean
Sundays or nights, but I mean during the working
hours of week days. A. During what period? Q. Well,
this period you have been complaining about, when there
were so many cars there, from the 25th to .the 28th of
October, and immediately before and after that. A. Yes;
I think there were some cars on the team tracks there all
the time. Q. For you to unload? A. Yes, sir. Q. Now,
you were not using those team tracks alone? Other con-
signees were unloading there all the time, and had cars
there for unloading? A. I presume so. Q. They were a
part of the public team tracks of the Burlington company

at Omaha for the general public use, were they not?   A.
I think so, I am not sure that they were all, but—   Q.
You did not claim any right to use those tracks other
than any other person having business with the company
had of the same kind?   A. No.   Q. Now, referring to the
five cars which are covered by the receipts, exhibits 1, 2,
3, 4 and 5, I think you paid $109 on them.   I call your at-
tention to the fact that all of these bills are made out to
the Russell Brokerage Company, are they not?   A. Yes, sir.
Q. And the bills in each case were made out to that com-
pany because that was the consignee of the cars?   A. I
presume so.   Q. And you are unable to say from your
knowledge that notice was or was not given to the Russell
Brokerage Company of the time of arrival of those cars,
at a time which would start the car service charges to
running, or at the times shown by these bills?   A. I have
no way of knowing what notice was given the Russell
Brokerage Company.   *   *   *   Q. Do you know that at
the time these cars arrived, or shortly before, the Union
Pacific had served notice upon the Burlington that it
would receive no more cars for your private track, for the
reason that it was full?   A. I do not know about that. Q.
Don't you know that was a fact?   A. The tracks were
full at the warehouse some part of the time, but the Bur-
lington had notice to deliver any cars that were refused
by the Union Pacific to their team tracks, and that they
would be unloaded at the team tracks.   Q. Did you ever
at any time make any request upon Mr. Holmes, or any
one connected with the local freight office, to have any
cars set upon the team tracks, when that request was not
complied with within a reasonable time?   A. I do not
know about that.   *   *   *   Q. Were you, during this
same time, receiving cars of sugar via other railroad lines
to be unloaded?   A. Yes, sir.   Q. And that took part of
your forces?   A. We had an extra force of men at
this warehouse up here, we hired considerable extra help,
both teams and men."   Herbert C. Kohn, who had charge
of the Russell Brokerage Company's business at that
time, testified that he had made no effort to find out

whether or not his company received notice of the arrival of car No. 30,695, which contained a shipment of sugar from Port Costa, and was reconsigned on the 28th day of November, and sent on to Sioux City.

It thus appears that the defendant's evidence in relation to the arrival, the notice of the arrival, and the unloading of the six cars in question was in no way disputed. Defendant also introduced in evidence its published schedules of tariff rates, rules and regulations adopted by the Western Car Service Association, of which it was a member, and approved by the interstate commerce commission, from which it appears that the defendant was required to charge and collect from shippers or consignees the demurrage or car service charges in question, and, had the defendant neglected to collect such charges, it would have been subject to prosecution for granting rebates to, or making discriminations in favor of, the consignee in this case.

Finally, it should be observed that the plaintiff alleged, in substance, and the evidence shows, that it could only unload from two to three cars a day; that all of the time for which the service charges were made there were from three to fifteen cars of sugar ready to be unloaded upon the team tacks. It therefore follows that to hold defendant's right to collect those charges dependent upon its having placed the cars in question upon the team track before November 28, 1907, would, in effect, require the doing of an impossible, useless, and vain thing.

From the foregoing it seems clear that the evidence was insufficient to sustain the judgment complained of, and the trial court erred in refusing to direct a verdict as requested by the defendant at the close of all of the testimony. Having arrived at this conclusion, it is unnecessary for us to consider or determine the jurisdictional question.

For the foregoing reasons, the judgment of the district court is reversed and the cause is remanded for further proceedings in accordance with this opinion.

REVERSED.