CHICAGO AND NORTH WESTERN RAILWAY COMPANY, APPELLEE, V. JOHN MALLORY ET AL., APPELLANTS.

23 N. W. 2d 735

FILED JULY 12, 1946. No. 32075.

*Evans & Lee* and *Kennedy, Holland, DeLacy & Svoboda,* for appellants.

*Dressler & Neely,* for appellees.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

MESSMORE, J.

This is an action at law to recover demurrage charges against a shipper. A jury was waived, and trial was had to the court. The court found generally in favor of the plaintiff and against the defendant, and rendered judgment for the plaintiff in the amount of $896.50, with interest from January 1, 1945, and costs. Upon the overruling of the motion for new trial, the defendants appeal.

The petition alleged, in substance, that the plaintiff is a common carrier operating a line of railroad between Atkinson and Long Pine, Nebraska; that the defendant Mallory had a contract for graveling certain public highways in western Nebraska, and the defendant bonding company signed the statutory bond required of contractors by which payment of all labor and materials, including transporta-

tion charges, were guaranteed by the surety. The petition then set out the factual situation upon which the demurrage charges on ten cars of gravel are based, and prayed for judgment in the amount of such charges.

The defendant bonding company denied generally the allegations of the petition, and alleged that plaintiff refused to furnish Mallory with facilities for unloading the gravel, without which he could not unload the cars due to extraordinary and freezing weather, and asked for a dismissal of the suit.

The defendant Mallory admitted the shipping of the cars of gravel, and alleged that the gravel content of the cars had frozen during the time the same was in transit, that the same were a solid mass of ice and gravel, and that it was physically impossible to unload the cars by the usual and ordinary methods or with the machinery and facilities which this defendant had available. The answer then set forth facts to show that the delay in unloading the cars was brought about by the carrier's refusal to furnish steam and water so that the lading could be thawed out sufficiently to make unloading possible. The answer also contained a general denial.

The reply alleged, in substance, that the railroad tariffs covering the shipment contained no provision which would authorize the carrier to give the shipper, or the shipper to receive free of charge, either steam or water service for the purpose of thawing out the shipment to make it easy to unload, and had the carrier furnished such service, it would have constituted a violation of sections 75-701 and 75-702, Comp. St. 1929, now sections 75-501 and 75-502, R. S. 1943, as an unlawful preference in view of said shipment. The reply contained a general denial of the affirmative allegations of defendants' answer.

For convenience, the defendants will hereafter be referred to as the appellants, and the plaintiff as appellee.

The appellants assign as error that the court refused to find under the evidence that the delay in unloading the cars

of gravel was caused by the unlawful and arbitrary refusal of the appellee to permit the shipper the use of the only available facilities for unloading the shipment, and the appellants, by reason of the arbitrary misconduct of the appellee, were relieved of liability.

The record discloses that car demurrage rules and charges known as I. C. C. No. 3722, certified by the State Railway Commission and applicable on the date involved within the state of Nebraska, provide in Rule No. 2, section A, paragraph 1, page 41: "Except as otherwise provided in paragraph 3, of this section, Forty-eight hours' (two days) free time will be allowed to partly or completely load, to partly or completely unload, or to partly unload and partly reload, all commodities."

Rule No. 3, section C, paragraph 1, page 43, provides: "On cars held for unloading, except as otherwise provided in Section B, Paragraph 1, of this Rule, time will be computed from the first 7:00 a.m. after placement on public-delivery tracks, and after the day on which notice of arrival is sent or given to consignee or party entitled to receive same."

Rule No. 4, section A, page 44, requires a carrier to give notice of arrival to the consignee or party entitled to receive the same, in writing, within 24 hours after arrival of the car, such notice to be sent by United States mail.

Rule No. 7, section A, page 46, provides demurrage charges for detention of cars beyond free time, for each of the first two days $2.20, for each succeeding day $5.50.

Rule No. 8, page 47 of the tariff provides certain causes for cancellation of demurrage charges. Section 1 provides: "When the condition of the weather during any part of the prescribed free time * * * is such as to make it impossible to work at loading or unloading, or impossible to place freight in cars or move it from cars without serious injury to the freight * * * the free time will be extended until a total of forty-eight (48) hours (ninety-six (96) hours on cars subject to Rule 8, Section A, Paragraph 2) free from

such interference shall have been allowed; provided, however, no such extension of free time will be allowed unless claim, stating fully the conditions which prevented loading or unloading within the free time, is presented in writing to this railroad within thirty days, exclusive of Sundays and legal holidays, after the date on which demurrage bill is rendered."

Paragraph 2 of the same section reads as follows: "When, at the time of actual placement, lading is frozen or congealed so as to require heating, thawing or loosening to unload, the free time shall be extended forty-eight (48) hours, making a total of ninety-six (96) hours' free time, provided the consignee shall, prior to the expiration of forty-eight (48) hours' from the first 7:00 a.m. after actual placement on an other-than-public-delivery track * * * send or give this railroad's agent a written statement that the lading of the car or cars therein identified by initials and car numbers will require heating, thawing or loosening to unload. If such written statement is mailed, the date of mailing will be settled by the postmark."

Sections 75-302 to 75-311, inclusive, R. S. 1943, detail the schedule of rates, charges, rules, and regulations which common carriers are allowed to establish, with the approval of the State Railway Commission. Acting under the authority of the statutes, the State Railway Commission promulgated and approved the demurrage tariff with which we are concerned in this case. These statutes provide for penalties for an overcharge on the fixed and established tariff rates filed with the commission; and provide further that the carrier is not to furnish any shipper any service not specifically provided for in the tariffs, and, for violation, fixes the penalty.

In this connection, in the case of Chicago & N. W. Ry. Co. v. Queenan, 102 Neb. 391, 167 N. W. 410, the court quotes with approval the following from Jelks v. Philadelphia & R. R. Co., 14 Ga. App. 96: "Since the law imposes upon a carrier the absolute duty to collect freight charges, it may proceed against either the consignee or the con-

signor; and, to relieve itself from the penalty imposed by law for failure to exact the charges, if it fails to collect them from the consignee it must proceed against the consignor. This is required as a matter of public policy. It is not only the right, but the duty, of the carrier to thus collect the charges."

And on page 397 of the same case it is said: "A shipper is conclusively presumed to know the contents of lawfully established tariffs applicable to his shipments, and, when such tariffs require that the freight charges be prepaid or guaranteed, the act of shipping *ipso facto* imposes on the shipper absolute liability for the payment of lawful charges. Kansas City S. R. Co. v. Carl, 227 U. S. 639. To relieve Kinney & Allen from the payment of the freight charges in this case would amount to a rebate, and would be a discrimination in their favor, which the law does not tolerate."

It will be observed from the foregoing case that the duty is imposed as explained therein on the part of the carrier to collect the freight rates, and on the part of the shipper to know the obligations of the tariff insofar as the same affects him.

The case of Updike Grain Co. v. Chicago & N. W. Ry. Co., 35 F. 2d 486, holds: "While tariff is in force, it is, in respect to rates named, to be treated as a statute binding as such upon both railroad and shipper.

"Effect should be given to every word, clause, and sentence of a railroad tariff in determining its construction, and in construing one part thereof resort may be had to other parts in order that whole may stand." See, also, Pillsbury Flour Mills Co. v. Great Northern Ry. Co., 25 F. 2d 66.

The demurrage tariff with which we are concerned is the statute which controls the carrier and the defendant Mallory, and the rules, regulations, and charges for the detention of cars beyond the free time are binding upon both of the parties.

Demurrage charges are part of the transportation, and a railroad company is obligated to charge and collect demurrage or car service charges in accordance with its tariffs, schedules, rules, and regulations.

Section 75-213, R. S. 1943, provides: "The State Railway Commission shall make and establish reasonable rates or charges, for each railway company or common carrier subject to its jurisdiction, for the use or transportation of loaded or empty cars on its road. It may establish for each railroad, or for all railroads alike, reasonable rates for the storing and handling of freight and for the use of cars not unloaded after forty-eight hours' notice to the consignee, not to include Sundays and legal holidays."

The tariff which controls the shipment in this case contains the rules and regulations applicable to loading and unloading of cars in the State of Nebraska during the period involved in this litigation. Its provisions are mandatory on the railroad and shipper alike.

In the case of the Nebraska Transfer Co. v. Chicago, B. & Q. R. R. Co., 90 Neb. 488, 134 N. W. 163, the court said: "It thus appears that the defendant's evidence in relation to the arrival, the notice of the arrival, and the unloading of the six cars in question was in no way disputed. Defendant also introduced in evidence its published schedules of tariff rates, rules and regulations adopted by the Western Car Service Association, of which it was a member, and approved by the interstate commerce commission, from which it appears that the defendant was required to charge and collect from shippers or consignees the demurrage or car service charges in question, and, had the defendant neglected to collect such charges, it would have been subject to prosecution for granting rebates to, or making discriminations in favor of, the consignee in this case."

In Shields Co. v. Chicago, B. & Q. R. R. Co., 133 Neb. 722, 276 N. W. 925, this court held: "In Nebraska the power to fix intrastate railroad rates for the shipment of freight

·was committed by Constitution and statute to the Nebraska state railway commission.

"An intrastate freight rate between two stations in Nebraska, when fixed by the Nebraska state railway commission, remains in force until changed by that tribunal."

In Lehigh Valley R. R. Co. v. United States, 188 F. 879, the court said: "It has been uniformly held by the Interstate Commerce Commission that demurrage charges are part of transportation, and are required to be filed with the Commission."

It is apparent that demurrage charges are as much a part of transportation as are the charges for the transportation of freight between stations.

With the foregoing authorities in mind to the effect that railroad tariffs have the force and effect of a statute binding as much upon railroad and shipper alike, and cannot be deviated from, and that demurrage charges are part of transportation which the railroad company is obligated to charge and collect in accordance with its tariffs, schedules, rules, and regulations, we set forth the material facts with reference to the shipment and demurrage charged in the instant case.

M. L. Wood, agent for the plaintiff stationed at Long Pine, Nebraska, in November of 1942 and who was charged with keeping the record of shipments at that point which show the exact date when the shipments arrive and discloses the car numbers and type of shipments, testified that ten carloads of gravel wherein the defendant, John Mallory, was consignor and consignee, arrived at 1:00 a.m. at Long Pine on November 24, 1942, shipped from Atkinson, Nebraska, about 40 miles east of Long Pine. These cars were placed on the team track at 2:00 a.m. November 24, 1942. Notice was sent to the defendant, Mallory, at 8:00 a.m. of the same day, through the United States mail, addressed at Long Pine, and contained a description of the cars, the numbers, and the contents. The shipment arrived with freight charges collect. It was also the duty of the agent

to note the temperature at his agency. On November 24, 1942, the date the shipment arrived, at 8:00 a.m. it was 42 degrees above zero; on November 25, 1942, at 8:00 a.m. it was 30 degrees above zero; on November 26, 1942, Thanksgiving Day, a holiday, the temperature was not taken. On November 27, 1942, at 8:00 a.m. the temperature was 30 degrees above zero, and on November 28, 1942, at 8:00 a.m. the temperature was 14 degrees above zero. Mallory appeared at the station on November 27, 1942, and started to unload. The regular freight charges were paid on that date. The agent looked at the gravel when he came on duty November 24, 1942, and it was not partially frozen at that time.

In addition to the notice sent through the United States mail, the agent called Mallory at Atkinson, and also at the State Engineer's office at Ainsworth, Nebraska, and failed to reach him.

Mallory testified that in sending the shipment from Atkinson to Long Pine he signed a written order in the presence of the agent at Atkinson, asking for delivery of the cars for loading of gravel to him on November 16, 1942, and they were delivered on November 20, 1942, and were loaded on November 21, 1942. Due to the fact that the cars were not delivered on November 16 for loading, he left Atkinson for his home at Thedford, Nebraska, and first heard that the cars had arrived at Atkinson on November 25, 1942. The equipment for unloading the cars of gravel, which is mounted on a Chevrolet truck and called a power hoist capable of unloading four or five cars a day, was set up in Long Pine on November 27, 1942. When Mallory arrived at Long Pine he found the gravel in the cars frozen from both ways, top and bottom, 16 to 18 inches on top, and a space between that and the bottom was still open, but the gravel was badly frozen. On November 27, 1942, two loads of gravel were taken out of the cars with picks and shovels. That afternoon Mallory and his employee, Pete Haussler, went to the station at Long Pine and contacted

the agent, telling him it was impossible to unload the gravel, and wondered if he could furnish water for some steam, or some water to help unload the gravel. The agent told him he had no authority to do so. Mallory made an investigation of the facilities at Long Pine for the purpose of unloading the gravel. He talked to the city officials about obtaining water and the use of a hose to attach to the city's hydrant. The hose the city furnished him was not long enough to attach to the city hydrant and reach the cars. The agent told Mallory it would not be possible to use the water through the meter where there is a hydrant located on the railroad property. This hydrant was about 25 feet distant from the tracks, and a hose attached to it would reach the cars. He had several talks with the agent about the gravel. On December 1, 1942, he and Haussler went to the roundhouse where section men were unloading gravel by using water. He then talked to the agent with reference to using the water from the company's hydrant. The agent refused, and Mallory had permission from the city of Long Pine to use water furnished by it. It was finally arranged to use the hydrant on the carrier's property, and Mallory to pay for all of the water used, and by the use of the water he was able to unload the cars.

The agent testified on cross-examination that he did not recall whether Mallory told him that he could not unload the gravel without the use of water or steam to thaw it out, that is, he did not know whether mention was made of water or steam, but he believed he talked about permission to get steam, and the agent handled this with the division superintendent at Chadron, Nebraska, and was informed that it would be impossible to turn on the steam. The agent said that he helped Mallory make arrangements with the city for the use of the water.

On December 9, 1942, Mallory sent a telegram to the agent at Long Pine, as follows: "Since you are unable to furnish steam to heat cars to thaw gravel will reject the. seventeen cars gravel at Long Pine Nebraska."

The agent testified that Mallory did not use the water until he had refused the shipment, and he started to unload the cars of gravel on December 13, 1942.

It will be observed from the foregoing testimony that Mallory's defense to this action is the denying to him of the use of either steam or water in connection with the unloading operation, and it is Mallory's contention that because of this refusal he could not unload the gravel until he did have the use of water, and there is no liability on his part for the payment of demurrage charges because of the failure of the carrier to assist him in providing for the unloading of the cars.

It will also be noted that this evidence is in conflict: First, whether or not Mallory desired the use of steam to unload the gravel and did not mention water is in dispute. The appellee's version seems to be borne out by the telegram in evidence, which corroborates the agent's testimony that Mallory first said nothing about procuring water but requested steam to loosen the gravel so it could be unloaded. Second, the question of whether or not Mallory was refused the use of water is in dispute. The agent testified positively that Mallory was not at any time denied water from the hydrant on the railroad property. The evidence also shows that the agent made an effort to locate Mallory on November 24, 1942, when the shipment arrived at Long Pine, by mail and by telephone calls. It was three days thereafter before Mallory arrived at Long Pine. It is also apparent from the record that the temperatures at Long Pine remained at or above a freezing level until November 28, 1942.

Referring to the tariff relating to demurrage charges, it provides for 48 hours free time, with the proviso that if the cars were not unloaded or loaded within the free time then a regular charge of $2.20 for each of the first two days, and $5.50 for each succeeding day, would be affixed. It provides for various grounds of cancellation of demurrage charges and for an extension of free time for as long as

96 hours could be arranged under certain conditions, upon written request to the carrier. No application was made, on the part of Mallory for an additional 48 hours. The tariff does not provide that the railroad company is obligated to furnish facilities for the unloading of cars, such as steam or water.

Sections 75-501 and 75-502, R. S. 1943, prohibit common carriers either directly or indirectly through any of their agents or employees, to collect or receive from any person, firm, or corporation a greater or less compensation for any service rendered or to be rendered by the carrier than it receives from any other person, firm, or corporation for a like service. Therefore, only the charges outlined in the tariff on file can be collected, and only the services provided for therein can be furnished. No such service was provided for or allowed by the demurrage tariff. In this connection, the appellants argue that payment of demurrage is usually excused or avoided if the detention or delay in unloading for which the charge is sought to be made was due to the fault of the carrier rather than a default or breach of duty of the consignee or shipper. See 13 C. J. S., Carriers, § 345, p. 810 and note.

Section 75-502, R. S. 1943, is cited by the appellants, as stating: If any railway company or common carrier as defined in section 75-301, through or by its officers, agents or employees, makes any particular person, company, firm, corporation or locality, or subjects particular description of traffic to any undue or unreasonable prejudice, delay or disadvantage in any respect whatsoever, the same shall constitute an unjust discrimination, which is hereby prohibited. However, this section provides in addition, the following: "or gives any undue or unreasonable preference or advantage to any particular person," etc.

The case of Virginia Iron, Coal & Coke Co. v. Director General, As Agent, and Norfolk & Western Railway Co. 61 I. C. C. 200, is cited as being in point with the appellants' contention. In this case the ore was frozen in transit and

the complainant failed to unload any of the cars within the prescribed free time. When the shipments were received, the carrier's demurrage tariff provided (1) No demurrage charges shall be collected under these rules for detention of cars through causes named below. Demurrage charges assessed or collected under such conditions shall be promptly canceled or refunded by the carrier. (2) When shipments are frozen while in transit so as to prevent unloading during the prescribed free time, then under this rule a consignee shall not be entitled to additional time unless within the prescribed free time he shall serve upon the carrier's agent a written statement that the lading was frozen upon arrival. In the opinion this language is used: "Shippers, however, are entitled to a reasonable free time for loading or unloading cars, and the principle has long been recognized that demurrage should not be imposed for delays occasioned by weather interference as defined in the demurrage rules above quoted in part." The demurrage charges were found to be discriminatory.

In the case at bar, the evidence shows without dispute that the gravel was not frozen in transit, and the demurrage tariff contained no such provisions as were involved in the appellants' cited case. The tariff with which we are concerned provided that when the condition of the weather during any part of the prescribed time (48 hours) was such as to make it impossible to work at unloading or loading, the free time would be extended until an additional 48 hours free time should have been allowed, provided, that claim was presented in writing to the carrier within 30 days after demurrage bill was rendered. Paragraph 2 of the same rule was to the effect that when at the time of actual placement lading is frozen so as to require heating, thawing or unloosening to unload, the free time shall be extended 48 hours, making a total of 96 hours free time, provided, again, written notice was given to the railroad agent. No such written notice was given in this case, as required by the tariff which governs the demurrage charges,

and the tariff did not provide for the cancellation of the demurrage charges as the tariff in the cited case by the appellants.

From an analysis of the tariff and facts under consideration in the case at bar, the cited case is not in point. The case of John Hawkins & Sons v. Director General As Agent, and Erie R. R. Co., 80 I. C. C. 225, which is also cited, is not in point on the facts or the provisions of the tariff involved. We conclude that under the facts and circumstances of the instant case appellants' argument is without merit.

Appellants rely on the following proposition of law: "It is a well-established principle of law that, while an 'act of God,' unavoidable accident, or the stress of circumstances, may not excuse the non-performance of an obligation created by contract, they will excuse the non-performance of a duty imposed by law," citing Chesapeake & Ohio Ry. Co. v. Board, 100 W. Va. 222, 130 S. E. 524, 44 A. L. R. 826. This was a claim for demurrage charges by the carrier against the consignee, where the cars were not unloaded within the free time provided for in the tariff. The unloading of the cars was prevented when men to the number of many hundreds, and perhaps thousands, engaged in an armed march on Logan County, and armed participants patrolled and were in complete charge of the public highways and railroad tracks. The defendants were ready and willing, and repeatedly tried to unload the cars in question, but were prevented by force and threats by the marchers from doing so. When the march was abated, the cars were immediately unloaded. The court held: "The duty of a consignee to unload cars within the free time given by the tariffs of a carrier, and the obligation to pay demurrage for their detention, are classified with those imposed by law, and where the failure of a consignee to unload within the free time is caused entirely by the intervention of a *vis major*, the consignee is not liable for demurrage."

It is apparent that the facts and circumstances of the cited case are not applicable to the case at bar, and the

proposition of law advanced by the appellants does not apply under the facts and circumstances of the instant case.

We have heretofore pointed out certain testimony that is in conflict. In this connection the rule of law is well established that where the testimony is in conflict and a jury is waived and trial is had to the court, the court's findings have the effect of a jury verdict, and will not be set aside on appeal unless clearly wrong. See In re Estate of Donlen, 145 Neb. 370, 16 N. W. 2d 731; Schnell v. United Hail Ins. Co., 145 Neb. 768, 18 N. W. 2d 112. Under the facts and circumstances of the instant case, the court's findings and judgment are not clearly wrong.

The bond posted by the defendant, Massachusetts Bonding and Insurance Company, provides: "It is expressly understood and agreed that this bond is given to secure and does secure not only the faithful performance by the principal herein named of said contract * * * but that it is given to secure and does secure also the payment by the said bounden John Mallory of all just claims for material, supplies, tools, fuel, lubricants, equipment, equipment rental, machinery, insurance premiums, and services used or consumed in the construction of the work by him or any of his subcontractors, and for the payment of all laborers and mechanics for all labor performed in the work by him or any of his subcontractors, and for all other just claims filed against him or any of his subcontractors in carrying out the provisions of this contract, * * * ."

There is no contention made by the bonding company or Mallory that the bond posted with the Department of Roads and Irrigation in connection with the contract allotted to Mallory for the graveling of certain highways, does not cover freight and demurrage charges on materials used in the performance of the contract.

In the case of Standard Accident Insurance Co. v United States, 302 U. S. 442, 82 L. Ed. 350, 58 S. Ct. 314, the court had before it the question involving a suit by a railroad company against the bond of a public contractor engaged in

building a post office, and held that railroad transportation came within the expression in the bond, "labor and material." In the opinion it was said: "Certainly labor is required for loading freight on railroad cars, moving these over the road, and unloading at destination. A carrier who has procured the doing of all this in respect of material has 'furnished labor'." Inasmuch as demurrage is a part of transportation charges, such an item is a proper charge against the contractor's bond along with labor and materials.

In Nye-Schneider-Fowler Co. v. Bridges, Hoye & Co., 98 Neb. 27, 151 N. W. 942, the court said: "If the contractor bought his materials in Chicago and paid the freight charges thereon to Fremont, the cost to him of the materials at Fremont would include the freight charges, and likewise, if he paid drayage to the building site, the cost of the materials that went into the building would include drayage also. Labor and materials that enter into the structure or are consumed in or about the work may be recovered for in such action, * * * ."

The foregoing language indicates that freight charges are, as in the instant case demurrage charges are, included in the bond. See, also, West v. Detroit Fidelity & Surety Co., 118 Neb. 544, 225 N. W. 673.

We conclude the judgment of the trial court is correct, and should be and is hereby affirmed.

AFFIRMED.